SLIP OPINION

Cite as 2017 Ark. 201

# SUPREME COURT OF ARKANSAS

No. CR-15-899

| | | |
|---|---|---|
| ZACHARY HOLLY | | **Opinion Delivered** June 1, 2017 |
| | APPELLANT | |
| V. | | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 60CR-2014-1089] |
| STATE OF ARKANSAS | | |
| | | HONORABLE BRAD L. KARREN, JUDGE |
| | APPELLEE | |
| | | AFFIRMED. |

**JOSEPHINE LINKER HART, Justice**

Zachary Holly was convicted by a Benton County jury of capital murder, rape, kidnapping, and residential burglary. Holly received the death penalty for capital murder, life sentences for the rape and kidnapping counts, and a twenty-year sentence for the residential burglary. On appeal, Holly raises three points, arguing that the circuit court erred by (1) denying his motion for a directed verdict for the residential-burglary charge because there was insufficient evidence that he entered or remained unlawfully in the home of another person; (2) granting the State's motion in limine and finding that his offer to plead guilty to capital murder in exchange for a life sentence was not admissible as a mitigating factor showing his acceptance of responsibility for his crimes; and (3) denying his motion to suppress his custodial statement. Our jurisdiction is pursuant to Arkansas Supreme Court Rule 4-3(i) (2017). We affirm.

Because Holly only challenges the sufficiency of the evidence with regard to his residential-burglary conviction, only a somewhat abbreviated recitation of the facts is

necessary. The victim, J.B., was a six-year-old girl that Holly and his wife Amanda often babysat while her mother, DesaRae Crouch,[1] was at work. Both Holly and his wife had a key to the house where the victim lived. Holly confessed to entering the residence by an unlocked side door after J.B.'s mother had gone to sleep. He went to the child's room, woke her, picked her up, and carried her to a nearby vacant house. Holly stated that after removing the child's pants, he "tried to stick it in," meaning penetrate the victim's vagina with his penis. Holly recalled that he then tied the child's pants in a knot around her neck and twisted the pants until she stopped kicking. A medical examiner determined the cause of death was ligature strangulation. A swab of the victim's vagina revealed the presence of semen that was a DNA match with Holly's.

We first consider Holly's argument that the circuit court erred in denying his motion for a directed verdict with regard to the residential-burglary charge. The pertinent evidence adduced at trial is as follows. DesaRae Crouch testified that she was a close friend of Holly's wife, Amanda. She had two young daughters who stayed with the Hollys while she was at work. Crouch stated that she trusted the Hollys to feed and bathe her children.

Crouch stated that on November 19, 2012, she ended her shift at a local convenience store just after 11:30 p.m. As usual, she collected her children from the Hollys' residence next door where they had fallen asleep on the Hollys' couch. Crouch carried one of her children, L.B., while Holly carried J.B. L.B. and J.B. shared the same bed. However, during the night, L.B. had a nightmare, so Crouch took her to her room to sleep. She left the side door

---

[1]Ms. Crouch's former surname was Bridgeman.

unlocked for her boyfriend or for Amanda Holly to come in and get medicine. When Crouch awoke at approximately 6:30 the next morning, she could not find J.B.

In his confession, which was introduced into evidence, Holly stated that he woke in the middle of the night on November 19, 2012. He claimed he had an upset stomach and got out of bed in search of some "Pepto." Clad only in his bathrobe, Holly entered the victim's house by the unlocked side door. In his confession, Holly denied knowing why he entered the house. According to Holly, upon entering, he just looked around. He saw that the door to Crouch's room was open and that she was asleep. He then went to the children's bedroom where he found J.B. and L.B. asleep. He woke J.B., and while she was still groggy, he told her to come with him. He carried J.B. from the house. In Holly's statement to the police, he claimed that he had not planned any of the events that transpired.

At trial, Holly preserved this issue by making the following directed-verdict motion:

> The last charge in the information, I believe, is residential burglary. That's codified at [Arkansas Code Annotated section] 5-39-201. Residential burglary. A person commits residential burglary if he or she enters or remains unlawfully in a residential occupiable structure of another person with the purpose of committing in the residential occupiable structure an offense punishable by imprisonment. Your Honor, with regard to this one, I'm going to need to direct the Court's attention also to [Arkansas Code Annotated section] 5-39-101 because the definition is going to be important there. In order to be guilty of residential burglary, you must enter or remain unlawfully. "Enter or remain unlawfully" is defined in [section] 5-39-101(2)(a). That definition says, "Enter or remain unlawfully" means to enter or remain in or upon premises when not licensed or privileged to enter or remain in or upon the premises." Your Honor, in this case, the proof has been that Desirea Bridgeman, through her testimony, was that Zachary Holly and Amanda Holly both had keys to her residence. They had the ability to come and go as they pleased when they were taking care of the child. They were allowed to go in and get things for the child. I believe she did state that Amanda could come over and get the medicine that night, but her testimony was they both had keys whenever I asked her about whether or not they could come in the house and then she said, of course, he had keys. So, Your Honor, would I

3

SLIP OPINION

contend that residential burglary the aspect of the enter or remain unlawfully has not been met in this case, and we would move for a directed verdict with regard to that charge, Your Honor, and specifically, just with regard to the fact he did not enter or remain unlawfully and that is an element of that crime. And the testimony we have before us is—is inconsistent with that Your Honor.

The circuit court denied Holly's directed-verdict motion.

Holly first argues that the circuit court erred by denying his motion for a directed verdict for the residential-burglary charge because there was insufficient evidence that he entered or remained unlawfully in the home of another person. He asserts that neither DesaRae Crouch nor any other witness testified that he was "without authority to enter or remain in her home." Holly notes that the door was unlocked and Amanda Holly had permission to enter and get medicine. This argument is not persuasive.

When we review the denial of a directed-verdict motion challenging the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict. *Conway v. State*, 2016 Ark. 7, 479 S.W.3d 1. That means that we consider only the evidence that supports the verdict and determine whether the verdict is supported by substantial evidence. *Id.* Substantial evidence is evidence of sufficient certainty and precision to compel a conclusion one way or another and pass beyond mere suspicion or conjecture. *Id.*

To sustain a conviction for residential burglary, the State must show that a defendant entered or remained unlawfully in the residence of another person with the purpose of committing an offense punishable by imprisonment while inside the residence. Ark. Code Ann. § 5-39-201(a)(1) (Repl. 2013). "To enter or remain unlawfully" is defined by statute to mean "to enter or remain in or upon premises when not licensed or privileged to enter or

remain in or upon the premises." Ark. Code Ann. § 5-39-101(2)(A).

Holly mischaracterizes Crouch's testimony. It is true that Crouch described a close friendship with Amanda Holly and that she allowed Amanda to enter her home to get medicine. However, there is no evidence that she had extended to Zachary Holly a similar privilege, much less a privilege to enter her home and take her children from their bed. *See Holt v. State*, 2011 Ark. 391, at 9, 384 S.W.3d 498, 505 (holding that Holt was not privileged to remain in the victim's residence once he began telling her that no one could have her if he could not and stabbed her); *Young v. State*, 371 Ark. 393, 402, 266 S.W.3d 744, 750 (2007) (holding that Young was not licensed or privileged to remain in the victim's trailer after Young began stabbing the victim and removing his property). While it is not disputed that the door was left unlocked, Crouch testified that she left the door unlocked for her boyfriend and for Amanda—not Zachary Holly. Accordingly, the circuit court did not err in denying Holly's directed-verdict motion.

Holly further argues that the residential-burglary statute contains a second element, that he entered the residence "having the purpose to commit a felony in that residence." He asserts that the State failed to prove this element by substantial evidence. We need not address this argument because it was not raised to the circuit court. On appeal, an appellant is bound by the scope and nature of his directed-verdict motion. *See Conte v. State*, 2015 Ark. 220, 463 S.W.3d 686. Furthermore, we have held that a sufficiency-of-the-evidence argument that is not properly preserved by a directed-verdict motion is not subject to our review under Arkansas Supreme Court Rule 4-3(i). *Foster v. State*, 2009 Ark. 454.

For Holly's second point on appeal, it is necessary to provide some additional facts and procedural history to give his argument proper perspective. Prior to his trial, Holly filed a document styled "Proffer of Guilty Plea" in which he offered to change his plea of not guilty in exchange for the State forgoing the death penalty. The State rejected the offer, and moved in limine to preclude Holly from telling the jury about it. Holly sought to use this plea proffer as evidentiary support for the mitigating factor that he had accepted responsibility for the crime prior to the beginning of the trial. Relying on *Howard v. State*, 367 Ark. 18, 238 S.W.3d 24 (2006), and Rule 25.4 of the Arkansas Rules of Criminal Procedure, the circuit court granted the State's motion in limine. The circuit court specifically found that the attempted guilty plea was "not admissible" and, when pressed for a ruling by Holly's trial counsel, found that the relevance of the proffered plea proffer was "moot." Holly then proffered a Form 2 verdict form listing the acceptance of responsibility for his crime as a mitigating circumstance. This mitigator was not submitted to the jury; however, a similar mitigator, that Holly confessed to his crime, was submitted and unanimously found by the jury to be a mitigator.

Turning to his argument, Holly asserts that the circuit court erred by granting the State's motion in limine and finding that his offer to plead guilty to capital murder in exchange for a life sentence was not admissible as evidence of a mitigating factor, i.e., acceptance of responsibility for his crimes. Arguing further, Holly states that the circuit court erroneously relied on *Howard*, and Arkansas Rule of Criminal Procedure 25.4 in its decision to prohibit the jury from "even being informed that there was evidence that [he] was willing

to accept responsibility for the crime prior to the trial. Holly contends that the circuit court's ruling violated the plain language of Arkansas Code Annotated section 5-4-602(4)(B)(i), which states, "Evidence as to any mitigating circumstance may be presented by either the State or the defendant regardless of the evidence's admissibility under the rules governing admission of evidence in a trial of a criminal matter." Holly argues further that *McGehee v. State*, 338 Ark. 152, 992 S.W.2d 110 (1999), and *Hobbs v. State*, 273 Ark. 125, 617 S.W.2d 347 (1981), demonstrate that the Arkansas Supreme Court has consistently applied the plain language of section 5-4-602(4)(B)(i), that evidence offered for purposes of mitigation in a capital case should not be refused simply because it would not be admissible in trial. Further, citing *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), Holly asserts that the Eighth and Fourteenth Amendments require that in capital cases, a circuit court cannot preclude a jury from considering, as a mitigating factor, "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

Regarding the circuit court's reliance on *Howard*, Holly argues that it is clearly distinguishable from the case at bar. He asserts that the question in *Howard* was whether defense counsel was ineffective for failing to submit as mitigation evidence the fact that the State had twice extended the offer of a life sentence to the defendant prior to trial. 367 Ark. at 48, 238 S.W.3d at 47. The *Howard* court cited *Lockett* for the proposition that a death-penalty statute must not prohibit the jury's consideration of relevant mitigating evidence, and it noted that under Arkansas law "relevant mitigating evidence" included the

character or history of the offender or the circumstances of the offense. *Id*. Although the court also cited Rule 25.4(a) in ultimately holding that Howard's counsel was not ineffective, the decision does not hinge on that rule. Furthermore, the *Howard* court did not consider the plain language of section 5-4-602(4)(B)(i), and his reason for proffering the plea-bargain evidence was much different. Holly contends that "presumably," Howard's argument was that his trial counsel should have put forth the evidence that he had twice rejected a life-over-death offer from the State to establish that the State had reservations regarding the prosecution of Howard or that he was unwilling to plead guilty because he was innocent of the charges, neither of which constitutes relevant mitigation evidence. In further distinguishing *Howard*, Holly asserts that the State's motivation in making a plea proffer has no bearing on the character or history of the offender or the circumstances of the offense. Likewise, a defendant's claim of innocence is not relevant in the penalty phase of a capital case as mitigation. In contrast, he proffered his guilty plea to show that he was willing to accept responsibility for his crime, which provides evidence of his character.

The State argues that Holly's proffered guilty plea is specifically excluded by Rule 25.4. Furthermore, it contends that Arkansas Code Annotated section 5-4-602(4)(B)(i) does not exclude the applicability of the Arkansas Rules of Criminal Procedure in the sentencing phase of capital cases. Further, it rejects Holly's efforts to distinguish *Howard*, claiming that it shows that this court correctly applied Arkansas Rule of Criminal Procedure 25.4 to the penalty phase and denied Howard's ineffective-assistance claim. *Howard*, 367 Ark. at 48, 238 S.W.3d at 47. The State argues further that Holly's guilty-plea proffer was not an attempt to accept

responsibility but an endeavor to avoid a sentence of death.

A circuit court has wide discretion in admitting evidence, including that presented during the penalty phase of the trial. *McGehee, supra.* On appeal, we will not reverse the circuit court's ruling absent an abuse of discretion. *Id.*

We note first that, in an evidentiary context, "relevant" and "admissible" are not synonymous. Relevant evidence is defined by Arkansas law as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Scherrer v. State*, 294 Ark. 227, 742 S.W.2d 877 (1988) (quoting Ark. R. Evid. 401). Admissible evidence is a subset of relevant evidence; the interplay between the concepts is described by Rule 402 of the Arkansas Rules of Evidence, which states, "All relevant evidence is admissible, except as otherwise provided by statute or by these rules or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible." Arkansas Rule of Criminal Procedure 25.4 entitled "Discussions, Agreements, Statements, Pleas and Judgments Not Admissible," is a rule of admissibility. It states:

> (a) No evidence of any discussion between the parties, of any statement made by the defendant, or of the fact that the parties engaged in plea discussions shall be admissible in any criminal, civil, or administrative proceeding, except in a proceeding to:
>
> (i) terminate or modify such an agreement;
>
> (ii) secure concurrence in a plea proffer;
>
> (iii) secure acceptance of a plea;
>
> (iv) secure withdrawal of a plea; or

SLIP OPINION

SLIP OPINION

(v) cause a judgment based upon a plea to be reversed or held invalid.

(b) Irrespective of whether a plea of guilty or nolo contendere is the result of a plea proffer, if it is not accepted or is withdrawn, or results in a judgment which is reversed or held invalid on direct or collateral review, neither the plea nor any judgment resulting therefrom, nor any statement by the defendant in connection with the making or acceptance of the plea or as a basis for sentence or other disposition thereon, is admissible in evidence against the defendant in any criminal, civil, or administrative proceeding.

Ark. R. Crim. P. 25.4. As Holly argues, in *McGehee* and in *Hobbs*, we have held that rules of admissibility do not preclude a criminal defendant from presenting *relevant* mitigation evidence.

We note that the *McGehee* court stated that section 5-4-602(4)(B)(i) does not open the way for the admission of irrelevant evidence. In the case before us, what Holly sought to prove by the admission of the plea proffer was that he was taking responsibility for his crime. While Holly argues that the plea proffer tended to show that he was accepting responsibility for his actions, language in the plea proffer fails to support this proposition. Proof that Holly offered to plead guilty in exchange for a lesser sanction is not evidence that Holly was taking responsibility for his crime. At the time he made his proffer, full responsibility for his crime carried with it the death penalty. While we acknowledge that the weight to be afforded relevant evidence is a decision for the jury, to be relevant, the evidence must tend to prove a fact in issue. *McGehee, supra.* Evidence that tended to show that Holly was *avoiding* full responsibility for his crime is therefore not relevant and therefore not admissible. *Id.* We are mindful that the circuit court excluded the proffered plea proffer because it found that it was not admissible under Rule 25.4 and found that the relevancy of the evidence was "moot."

However, we do not reverse an evidentiary ruling by a circuit court when it uses the wrong reason to reach the right result. *Dandridge v. State*, 292 Ark. 40, 727 S.W.2d 851 (1987). In this instance, Holly's plea proffer was conditioned on the State's removing the death penalty from the jury's consideration, leaving life without the possibility of parole as the only permissible punishment. Thus, in our view, the offer to plead with the stated condition was not relevant mitigating evidence as it did not support the purpose for which it was offered.

Our holding is consistent with *Lockett* and its progeny. The analysis of the Sixth Circuit in *Owens v. Guida*, 549 F.3d 399 (6th Cir. 2008) is illustrative. *Owens* is a Tennessee death-penalty case in which the condemned woman asserted that the State violated her right to present as mitigating evidence proof that she had been willing to accept the State's offer of a life sentence in return for a guilty plea. *Id.* The *Owens* court, in affirming a federal district court's denial of federal habeas relief, stated:

> In *Lockett*, a plurality of the Supreme Court said that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604, 98 S. Ct. 2954 (plurality opinion). As a constitutional requirement, this rule trumps other limits on admissible evidence, such as hearsay. Yet the Court qualified this broad statement with a footnote stating that "[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 604 n. 12, 98 S. Ct. 2954.

*Owens*, 549 F.3d at 419. As in the case at bar, the *Owens* court similarly rejected the appellant's argument that the evidence was needed to support a mitigator that she had taken responsibility for her crime. *Id.* It cited with approval the Tennessee Supreme Court's

conclusion that Owens's confession, which was entered into evidence, was sufficient proof to support that mitigator. *Id*. Furthermore, the *Owens* court held that a guilty plea conditioned on the accused avoiding the death penalty was not evidence that she had accepted responsibility for her crime; rather, it showed "she was less interested in accepting responsibility and more interested in avoiding the electric chair, a motivation that is much less persuasive as a mitigating factor." *Id*. at 420. For the foregoing reasons, we hold that the circuit court's decision to exclude Holly's proffered plea proffer is not reversible error.

Holly's third and final point on appeal concerns the denial of his motion to suppress his confession. In *Jackson v. Denno*, 378 U.S. 368 (1964), the Supreme Court held that a criminal defendant is entitled to a hearing regarding the voluntariness of any confession before it can be admitted into evidence. The *Denno* court stated:

> It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, and even though there is ample evidence aside from the confession to support the conviction. Equally clear is the defendant's constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession.

*Denno*, 378 U.S. at 378 (citations omitted). A criminal defendant's Fifth Amendment right to counsel attaches during custodial interrogation. *Airsman v. State*, 2014 Ark. 500, 451 S.W.3d 565 (citing *Edwards v. Arizona*, 451 U.S. 477 (1981)). Once an accused has invoked his right to have counsel present during custodial interrogation, the Fifth Amendment precludes further questioning by police until counsel has been made available unless the

accused validly waives his right to counsel. *Id*. A valid waiver requires that the accused himself initiates further contact with police. *Id*. However, the "impetus" must come from the accused himself, not the police. *Id*. (citing *Metcalf v. State*, 284 Ark. 223, 681 S.W.2d 344 (1984)).

Holly's *Denno* hearing was held on August 1, 2014. Prior to taking testimony, audio recordings of Holly's "interaction" with police and the transcripts of those recordings were admitted into evidence by stipulation. There were two recordings made on November 20, 2012, a formal interview inside the Bentonville Police Department, and an informal interview in the parking lot outside the Bentonville Police Department. On November 21, 2012, a recording was made during an encounter with police at the apartment complex where Holly's brother resided. On November 23, 2012, there were phone calls from Holly to the Bentonville police and from the Bentonville police to Holly, as well as a formal interview inside the Bentonville Police Department. On November 26, 2012, Holly gave his confession inside the Bentonville Police Department.

Detective Mike Stegall testified that his first interaction with Holly occurred in a Bentonville Police Department Criminal Investigation Division interview room. Stegall stated that the purpose of the interview was to establish a sequence of events because he viewed Holly as a potential witness. Stegall first spoke to Amanda before interviewing Holly. Holly was not Mirandized, nor was he under arrest. The interview lasted sixteen minutes.

The next day, Stegall encountered Holly outside the Maddox Apartments off of Eighth

Street in Bentonville, where Holly's brother resided. Amanda and other unidentified individuals were present. Stegall asked Holly to submit to a follow-up interview, but Holly declined. According to Stegall, Holly stated, "I think I want an attorney" and "[U]ntil I see DNA results I'm not doing anything." That was Stegall's last interaction with Holly.

Bentonville detective Sergeant Kris Moffit testified that on November 20, 2012. he and Detective Wiseman made contact with Holly at the intersection of Southeast A and Eighth Streets in Bentonville at approximately 2:10 in the afternoon. He knew that Stegall had already interviewed him, but asked Holly to return to the police department for a second interview. According to Moffit, he made it clear that participation in the interview would be strictly voluntary and that he would be free to leave at any time. The interview started after Holly ate the lunch that he had with him. Including a twenty-minute break, the interview lasted for one hour and 41 minutes. According to Moffit, he knew from Stegall that Holly had asked to speak with an attorney. After a discussion, they decided against further contact with Holly unless he initiated it. On November the 23, Holly called and scheduled the interview. Moffit assured Holly that it was understood that the interview was voluntary. Holly was interviewed and given a ride home. The next contact with Holly occurred on Monday, November 26. After the November 23 interview, Moffit understood that Holly expected law enforcement to contact him for a follow-up interview. Moffit stated that he called on November 26 to ask Holly to come to the police department. When he made the phone call, Amanda answered. He explained that the police wanted to sit down and talk with

him and asked for both of them to come to the police department. She agreed.

When the Hollys arrived at the police station on November 26, Holly was brought to an interview room. Prior to his interview with Holly, Moffit stated that he read Holly his *Miranda* rights because a decision had been made to arrest him, and he was in custody. Moffit opined that Holly seemed to understood his *Miranda* rights. He likewise opined that Holly did not seem to be under the influence of drugs or alcohol. Moffit stated that he was mindful that Holly had invoked his right to counsel, which meant that to legally question him further, Holly had to initiate the contact. He asserted that Holly had done so on November 23. Moffit acknowledged that Holly had asked for his mother, for Amanda, and for a cigarette, but he was told that they would not honor these requests until the interview was over.

Bentonville Detective J.C. Wiseman testified that he and Detective Moffit watched Stegall's interview with Holly on November 20, 2012. He and Moffit subsequently approached Holly, who was with a group of people outside an apartment complex, and invited him to submit to a follow-up interview. He stressed that participation was voluntary and that he could leave at any time. Holly agreed and submitted that day to a 40-minute interview.

Wiseman testified further that on November 21, 2012, he learned from Stegall that Holly had invoked his right to counsel. However, Holly called the police department and agreed to a supplemental interview. He and Moffit gave Holly a ride to the Benton County Sheriff's Office on November 23, 2012, and gave him a ride home after the interview. Wiseman also testified that he was present when they arranged for an interview with Holly on

November 26, 2012. Holly was read his *Miranda* rights because he was going to be arrested

and was not free to leave during the interview. According to Wiseman, Holly was "alert,

conscious, cognizant of what was going on," and appeared to understand his *Miranda* rights.

At no point in the interview did Holly invoke his right to counsel or his right to remain silent.

Benton County Deputy Jeremy Felton testified that he was assisting the Bentonville

Police Department with the Holly investigation. He also interviewed Holly. According to

Felton, Holly told him that he had contacted Moffit to submit to a further interview. Felton

further testified that prior to speaking with Holly, he read him his *Miranda* rights. Holly told

him that he had spoken with "several attorneys" who advised him against submitting to an

interview with police, but he chose to speak with them anyway. According to Felton, when

he concluded his interview with Holly, Holly expected a follow-up interview with Bentonville

police. He was aware that Holly had only a tenth-grade education and claimed to read at the

third-grade level; however, he "absolutely believed" that Holly had sufficient intellectual

capacity to participate in the interview.

After arguments of counsel, the circuit court denied Holly's motion to suppress. It

made extensive findings of fact and conclusions of law:

> The Court finds that the defendant initiated the contact with the police after invoking
> his right to counsel for an additional interview. The defendant signed a waiver of rights
> form concerning the additional interview. The defendant signed a waiver of rights
> form when he was at a custodial statement, and the defendant was knowingly and
> voluntarily waiving that right. Based upon the length of the interrogation, it's not such
> that it overrode the defendant's will or was coercive or unreasonable. The defendant's
> request for his wife or mother was not an unequivocal right to counsel or right
> to remain silent. Defendant's previous contact with police history shows that he was

able to terminate earlier interviews. The Court has the following findings of fact: That the defendant is being charged with Capital Murder, Rape, Kidnapping, Residential Burglary. That on the morning of November 20, 2012, it was determined by the State that J.B. was the victim of a homicide. That on November 20, 2012, at 8:42 a.m., Detective Mike Stegall of the Bentonville Police Department conducted an interview with the defendant, Zachary Holly. Defendant was not given a statement of rights. State's Exhibit No. 7, which is the November 20, 2012, interview conducted at 2:27 p.m. between Detective Kris Moffit and Jason or Jerrod Wiseman, was an interview at the Bentonville Police Department. The defendant was not given a statement of rights. Exhibit 7, page 58, defendant was told that he was not accused of anything. Defendant was told he was there voluntarily. Defendant had asked to go home. Detective Moffit then told the defendant he was free to leave at any time. Exhibit 7, page 60, the defendant stated he wanted to go home. Detective Moffit stated that was all right. Exhibit 7, page 61, defendant requested an additional interview for tomorrow morning, the next day. The current interview was then terminated. There was an exhibit that was dated November 20, 2012, at 4:17 p.m. It was a conversation with Zach Holly in the parking lot of the Bentonville Police Department after the second interview. Kris Moffit told the defendant he wasn't being truthful. The defendant said, I'm going home, and the defendant then left. Exhibit 11, a conversation with Zachary Holly on November 20, 2012. Jerrod Wiseman testified, and the transcript showed, that at approximately 4:17 p.m., which was after the conversation with Zachary Holly in the Bentonville Police Department parking lot, defendant consented to giving Jerrod Wiseman defendant's shoes, jacket, bandanna, hat, pants, and socks to Detective Wiseman. On November 23rd, 2012, Detective Stegall testified the defendant unequivocally invoked his right to counsel. Detectives Moffit and Wiseman testified that they terminated all contact with the defendant. On November 23rd, 2012, Detectives Moffit and Wiseman testified that the defendant contacted Detective Moffit for an additional interview and the defendant requested a ride to the Bentonville Police Department for the additional interview. In an exhibit that was entered dated November 26, 2012, with Jeremy Felton from the Benton County Sheriffs office, conducted the additional interview with the defendant. Defendant was provided a statement of rights form and waived his right to counsel, his right to appointed counsel if he could not afford one, his right to stop questioning at any time, and his right to consult an attorney. The defendant then executed a waiver of rights form. Detective Moffit then testified the defendant requested information about the additional interview and that he would be contacted. On November 26, 2012, Detective Moffit testified that he did contact the defendant's wife about information from the additional interview. Exhibit 21, State's Exhibit 21, dated November 26, 2012, was an interview with the defendant. It was one hour and 21 minutes. Detective Moffit and Detective Wiseman provided defendant his statement of rights, including his right to remain

silent, his right to speak to an attorney, his right to be appointed an attorney, and his right to stop questioning. Detective Moffit and Wiseman stated that defendant was under arrest at that time and was not free to leave. The Court had reviewed the DVD and saw that the defendant had stayed calm throughout the interview until he concluded that he was going to prison. The detectives' use of profanity was minimal and was not patently offensive. Exhibit 21, page 17, the defendant requests -- in fact earlier when they're discussing -- were talking -- the detectives talked to the defendant, it was the defendant that requested that they change the subject and talk about what they wanted to, which was about the investigation. . . .. Exhibit 21, page 19, defendant requested his wife be present. Exhibit 21, page 35, the defendant requested a cigarette. Detective Moffit told the defendant, Well, let's get this started and then we'll have a cigarette. Exhibit 21, page 36, the defendant requested his wife. Detective Moffit said, We'll give you an opportunity to talk to her. Exhibit 21, page 31 and page 36, the defendant concludes he is going to prison.

The circuit court concluded that although Holly "unequivocally" had invoked his right to counsel on November 21, he made a valid, knowing, and intelligent waiver of that right by initiating further contact with the police on November 23 and 26 and voluntarily submitting to an interview. He memorialized this waiver by executing waiver-of-rights forms on November 23 and November 26. Further, while Holly has limited education and academic achievement, he nonetheless demonstrated appreciation for his rights by terminating interviews twice before the interview in which he gave his confession. Finally, the circuit court concluded that promises by the police to allow him to see his wife, his mother, and his stepmother and to smoke a cigarette after the interview had finished did not induce Holly to make his statement.

Subsequent to the *Denno* hearing, Holly filed another motion to suppress his custodial statement. He alleged that the police had used Amanda to coerce him into submitting to the interview that resulted in his confession. Unlike the *Denno* hearing, the focus was on how the

police used Amanda to compel Holly to submit to police interviews after he had invoked his right to counsel.

Amanda testified that at the time of the murder, she had been married to Holly for approximately eight months. However, she stated that they had known each other for fifteen years and had been a "couple." On the day that J.B.'s body was discovered, she recalled being taken to the police station that morning and again that evening. The police told her that Holly was a suspect, which upset her. She estimated that she spoke with the police at least five or six times that week. Amanda stated that she attempted to take two polygraph tests, but the first time, on November 22, they declined to administer the test because she had not "slept enough or eaten enough." She took and passed a polygraph test the next day. Amanda testified further that Wiseman and Moffit interviewed her further, and they emphasized that they still thought Holly was a suspect. Amanda stated that she heard Holly tell Stegall on November 21 that he did not want to speak to the police again without a lawyer. However, after the police left, she told Holly that he had one of two choices: "Take the polygraph and clear his name or I take my son and I leave." Nonetheless, she stated that while she would have pressured Holly to take the polygraph to clear his name completely, if the police had not advised her that they wanted him to take a polygraph, she did not know whether she would have told him to take the exam. She further testified that her son, who "spent every waking moment with J.B." was taken to her mother's house after school and remained there until Holly's arrest. She and her mother had decided not to have him return home until Holly was cleared of wrongdoing.

Wiseman testified that Amanda was present at every interview involving Holly. He confirmed that Amanda conducted a "controlled" phone call with Holly. Testifying further, Wiseman stated that in the first interview on November 20, he was not aware that Holly relied heavily on Amanda; however, when the interview was concluded, Holly stated that he had to talk to his wife and his child. After the interview he conferred with Moffit and Stegall to devise an interrogation strategy. Wiseman subsequently became aware that on November 21, Holly had invoked his right to counsel. They nonetheless maintained daily contact with Amanda. He admitted that they "hoped" she would "encourage" Holly to talk to them. He confirmed that he conveyed to Amanda his belief that Holly had murdered J.B. However, Wiseman insisted that "[n]o one in my presence, Detective Moffit or anyone else, asked Amanda Holly to go ahead and ask [Holly] a question, collect any evidence, do anything of that sort. We never implied to her the need to do that. Never offered Amanda anything to do that."

Moffit testified that he spent approximately four hours interviewing Amanda Holly between November 20 and November 23, the most contact he had with anyone in the case. During the first interview that he observed with Stegall, he decided that Holly was a suspect. Moffit stated that he built a rapport with Amanda because they "hoped" she would give them information if she "heard" anything and convince Holly to submit to another interview. However, throughout the process, Amanda steadfastly believed in Holly's innocence. Moffit admitted that after Holly had invoked his right to counsel, he did say to Amanda, "Please talk

SLIP OPINION

to him," and the police "hoped" she would.

After arguments of counsel, the circuit court denied the motion to suppress:

I find that Amanda Holly was the one that wanted to do so, she was the one that contacted them and the police tried to hold her back. Mr. Holly signs a statement while he's doing the polygraph exam that he's not being coerced. I find the State has met its burden by a preponderance of the evidence and that the defendant's motion to suppress that statement by being coercive in violation of 2.2 and 2.3 is denied.

On appeal, Holly argues that the circuit court erred by denying his motion to suppress his custodial statement. He asserts that he "unequivocally" invoked his right to counsel, and law enforcement did not "scrupulously" honor his request. Instead, the police used his wife to "coerce" him to waive his right to counsel and give a custodial statement. Holly asserts that the police had daily contact with Amanda and used her to pressure Holly into submitting to additional interviews. Amanda acted on behalf of the police's by threatening to leave him if he did not submit to further interviews with the police. Holly concedes that there is no Arkansas precedent on point but directs this court to *United States v. Sanchez*, 614 F.3d 876 (8th Cir. 2010) as support for the proposition that Amanda acted as an instrument of police coercion to compel him to submit to an interview. Further, he cites *Commonwealth v. Mahnke*, 335 N.E.2d 660 (Mass. 1975) for the proposition that police may not accomplish through private proxies what they cannot do directly. He contends that Amanda acted as an agent of the police, regardless of whether she was intentionally doing so. We are not persuaded.

We review a circuit court's decision denying a defendant's motion to suppress a confession by making an independent determination based on the totality of the circumstances.

SLIP OPINION

*Airsman*, *supra*. However, a circuit court's factual findings will be reversed only if they are clearly against the preponderance of the evidence. *Id*. A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily. *Id*.

In *Taylor v. Gill*, 326 Ark. 1040, 934 S.W.2d 919 (1996), this court discussed the principles of agency recognized by Arkansas law. The *Taylor* court stated that the two essential elements of an agency relationship are (1) that an agent have the authority to act for the principal and (2) that the agent act on the principal's behalf and be subject to the principal's control. *Id*. (citing *Pledger v. Troll Book Club, Inc.*, 316 Ark.195, 200, 871 S.W.2d 389, 392 (1994). While we are mindful that the police actively sought to enlist the aid of Amanda to get Holly to initiate further contact with them after he had invoked his right to counsel, we hold that their efforts fell short of making Amanda their agent. Furthermore, this court has held that an individual is considered an agent of the government only "when it is established that the private individual acted at the direction of a law enforcement agency or officer." *Parette v. State*, 301 Ark. 607, 611–12, 786 S.W.2d 817, 820 (1990).

It is not disputed that Amanda encouraged Holly to submit to further interviews and take a polygraph exam. However, at all times, Amanda was motivated not by a desire to help the police but to encourage Holly to "clear his name." While Amanda's efforts ultimately resulted in Holly giving incriminating evidence, the police exerted no direct control over Amanda. At all times, the police made it clear to her that their reason for speaking to Holly

was that they believed he was guilty. The circuit court found that Amanda's efforts were motivated by her own desires and not directed by the police. We hold that this finding was not clearly against the preponderance of the evidence. Moreover, after Holly's *Denno* hearing the circuit court found that Holly initiated further contact with the police after he had invoked his right to counsel and that his waivers of counsel in subsequent interviews were made knowingly and intelligently.

We note further that Holly's reliance on *Sanchez* and *Mahnke* is misplaced. It is true that the Eighth Circuit stated in *Sanchez* that

> "the constraints of the ... Fifth Amendment[ ] do not apply to purely private activity." *United States v. Garlock*, 19 F.3d 441, 442 (8th Cir.1994). But "the government can exercise such control over a private actor that a 'private' action can fairly be attributed to the government for purposes of the ... Fifth Amendment." *Id*. at 443. A defendant must demonstrate "that, in light of all the circumstances, [the private individual] acted as an instrument or agent of the government." *Id*. (internal quotations and citation omitted). A defendant satisfies this test "by showing that the government exercised such coercive power or such significant encouragement that it is responsible for [the private individual's] conduct, or that the exercised powers are the exclusive prerogative of the government." *Id*. (internal quotations and citation omitted).

*Sanchez*, 614 F.3d at 886 (alterations in original). Nonetheless, the *Sanchez* court reversed a federal district court's suppression ruling where Sanchez's mother brought her son to police and ordered him to talk to her. While Amanda may have motived Holly to speak with police, there is no evidence that he was overwhelmed by her desire for him to interact further with police. Likewise, in *Mahnke*, the Massachusetts Supreme Court held that private action by individuals that induced a confession by a man suspected of killing his girlfriend did not violate his rights under *Miranda*. In short, Amanda's desire that Holly "clear his name" did not

23

directly translate into coercion to give a confession without the benefit of legal counsel. We therefore affirm the circuit court's denial of Holly's motion to suppress his custodial statement.

In compliance with Arkansas Supreme Court Rule 4–3(i), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Holly, and no prejudicial error has been found.

Affirmed.

WOOD, J., concurs.

**RHONDA K. WOOD, Justice, concurring.** Arkansas Supreme Court Rule 4–3(i) provides that in cases involving a sentence of death or life imprisonment, that "the Court must review all errors prejudicial to the appellant." A complete review of the record reveals the circuit court had to deal with extraordinary issues during these proceedings and handled them quite adeptly. While I cannot say that there is an error in the record, the manner in which defendant's counsel dealt with the defendant's mental competency is troubling.

Defense counsel raised the issue of the defendant's mental competency early in the case. The parties agreed to have the defendant placed at the Arkansas State Hospital for a mental evaluation. On May 29, 2013, the court conducted a mental-status hearing. Defense counsel informed the court that the State's evaluation was complete and that the defense had subsequently hired its own mental evaluator, Dr. Patti Walz. The first mental evaluation is included in the record and includes a finding that the defendant was competent. On August 30, 2013, the court conducted a second mental-status hearing. Defense counsel informed the

court that the second evaluation was complete, and a written report was prepared. All parties agreed that the report would be provided to the State and the circuit court; the report would also be filed under seal. Yet defense counsel did not actually state that he had a copy or had even read the report. It is unclear whether at that point he was relying on an oral or a written report. However, defense counsel announced that his client "is fit to proceed." The court accepted that statement and entered an order finding the defendant fit to proceed.

It is troubling that the second mental evaluation was never filed in the record. Given that the first evaluation found the defendant fit to proceed and his counsel announced he was fit to proceed, I cannot find under our Rule 4–3(i) review that it was a prejudicial error for the court to find the defendant fit to proceed. However, one cannot review what is absent from the record.

Adding to the confusion is that the issue was raised again. At a subsequent hearing, defense counsel stated that he had reviewed both evaluations and did not see an *Atkins* issue. *See Atkins v. Virginia*, 536 U.S. 304 (2002). However, that occurred at the same hearing where defense counsel was removed for substance-abuse problems. Additionally, at that hearing, his co-counsel stated the mental-capacity issue "hasn't been adequately developed." The record is largely silent regarding his capacity following that hearing. It is apparent that the circuit court was extremely concerned and made every allowance to let defense have additional time to prepare. However, the extent of the defense preparation is unclear from the record.

Because the sentence in this case may become irrevocable, it is my hope that any outstanding issues concerning the defendant's competency and counsel's adequacy of representation on these issues will be fully developed and resolved in Criminal Procedure Rule 37 proceedings.

*Robert M. "Robby" Golden*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Kristen C. Green* and *Brooke Jackson Gasaway*, Ass't Attorneys Gen., for appellee.