Cite as 2020 Ark. 154

# SUPREME COURT OF ARKANSAS

No. CR-19-383

| | | |
|---|---|---|
| SAMMIE L. THOMAS, JR. | | **Opinion Delivered**: April 23, 2020 |
| | APPELLANT | |
| | | APPEAL FROM THE FAULKNER |
| V. | | COUNTY CIRCUIT COURT [NO. 23CR-16-834] |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE CHARLES E. CLAWSON, JR., JUDGE |
| | | <u>AFFIRMED</u>. |

**JOSEPHINE LINKER HART, Justice**

Sammie L. Thomas, Jr., was convicted by a Faulkner County jury of capital murder for the shooting death of Robert Lee Givens. Thomas was sentenced to life without parole in the Arkansas Department of Correction. On appeal, Thomas argues that the evidence was insufficient to sustain his capital-murder conviction and that the circuit court erred in denying his motion to suppress tracking data generated by his cellphone. Our jurisdiction is pursuant to Arkansas Supreme Court Rule 1-2(a)(2).

## I. *Sufficiency of the Evidence.*

Thomas was charged by information with capital murder and possession of a firearm by certain persons. In pertinent part, a person commits capital murder if the person "[p]urposely discharges a firearm from a vehicle at a person or at a vehicle . . . that he or she knows or has good reason to believe to be occupied by a person; and [t]hereby causes the death of another person under circumstances manifesting extreme indifference to the

value of human life." Ark. Code Ann. § 5-10-101(a)(10) (Repl. 2013)

Mr. Givens's daughter, Lacrease Givens, testified that late at night on September 8, 2016, she called her father to help her fix a flat tire. He picked her up and took her to Wal-Mart to get a can of "fix-a-flat." As they were returning to Lacrease's car, an SUV began to follow them. At a stop sign, Mr. Givens opened his door and asked, "Do you know me? Do I know you?" Thomas told him that he "had the wrong person." However, Thomas continued to follow them. Mr. Givens again stopped and opened his car door. Once more he confronted Thomas, asking, "Do I know you?" Thomas responded "No," and Mr. Givens profanely suggested that Thomas was not acting properly. Mr. Givens resumed his driving. Thomas sped up and pulled around Mr. Givens's car. When he reached the driver's side, Thomas fired a single gunshot at Mr. Givens and sped away. The bullet hit Lacrease's father in the temple, causing him to fall onto Lacrease, and the car crashed. Lacrease survived. She identified the shooter's car as a tan, older model SUV.

Conway police officer Ryan Britton responded to a call about a rollover accident. On arrival, he encountered a "hysterical" woman, later identified as Lacrease. From his brief conversation with her, he learned that her father had been shot by someone in an older tan SUV. Nearby, he discovered a black Ford Explorer that had left the roadway, traveled through a yard, hit a carport post, and come to rest on its side in a stand of trees. The driver was motionless and slumped over. Sergeant Britton was soon joined by Officer Melissa Smith. Officer Smith saw that the driver had a gunshot wound on the side of his head. Shortly thereafter, Sergeant Britton found a .45-caliber shell casing in the roadway

2

along the path traveled by Mr. Givens's vehicle.

Officer Smith testified that after the shooting, Thomas was developed as a suspect from a report by a witness in an unrelated matter.[1] The witness told police that Thomas and her daughter had been in an "off and on" relationship and that she feared for her daughter's safety. She stated that Thomas had a .45-caliber pistol and was driving a gold-colored SUV.

The weapon and the vehicle matched to a homicide, Officer Smith sought more information. She learned from another officer that Thomas was living on Waterfront Cove and that Thomas was associated with a woman named Jana. Officer Smith drove to Waterfront Cove in search of a gold-colored SUV. When she located a gold Buick Rendezvous, she contacted the owner, Jana Kelly. Kelly told her that Thomas drives her vehicle. She also volunteered that she had added Thomas to her cell-phone plan and given him a phone for his personal use. Apparently believing that she would exonerate Thomas, Kelly revealed to Officer Smith that she had a tracking feature in her phone plan that recorded the location of the phones. She volunteered to give police a screenshot of the location of Thomas's phone at the time of the shooting. The screenshot placed the phone within a place and time that coincided with the shooting. Based on this information, Officer Smith drafted a warrant to obtain records of Thomas's cell-phone locations (CSLI) from AT&T.

---

[1]This testimony was developed at a pretrial hearing, as set forth in greater detail below.

Subsequently, Officer Smith examined Mr. Givens's vehicle at the tow yard. She photographed the hole made by the bullet.[2] As part of her investigation, she placed a rod in the hole to determine the bullet's trajectory. She concluded that the bullet penetrated the back driver's-side window and penetrated the door post just behind the driver's seat. Because no other bullets were found and the windshield was intact, she opined that the hole was made by the bullet that was recovered from Mr. Givens's head.

Conway police officer Brandon Huff testified that on September 14, 2016, he arrested Thomas. At the time of his arrest, Thomas provided him with his phone number, 501-499-1384. He also obtained from Thomas some keys, and he turned them over to Detective Melissa Smith. Officer Smith stated that the key was used to unlock a Buick Rendezvous located at Jana Kelly's residence. She also obtained cell-phone records from AT&T that were associated with the phone number provided by Thomas.

Brian Ward, an engineer for AT&T, testified that he was the keeper of cell-phone records that the State introduced into evidence. The records related to a cell-phone number, 501-499-1384, that was billed to Jana E. Kelly. Ward was directed to a section of the records in which "Historical Precision Location Information" (HPLI) was listed. He confirmed that HPLI consisted of a log of a device's date, time, and GPS location. Ward was able to place the device at a specific geographic coordinate near the time of the shooting to within an accuracy of less than 1500 meters.

---

[2]Detective Joshua Fullbright testified that he was called to the scene of the shooting on September 9. He stated that he collected the .45-caliber shell casing and sponsored it into evidence.

The State called Jana Kelly Thomas. She confirmed that on the date of the shooting, her name was Jana Kelly and that the cell-phone records concerned her device. Jana testified that she met Thomas, who is her husband's cousin, in 2016. By May 2016, Thomas began to reside at her house. She confirmed that she allowed Thomas to use her 2004 tan Buick Rendezvous SUV. She also confirmed that she added Thomas to her AT&T cell-phone plan. According to Jana, she had a "Family Sharing App" that allowed her to track Thomas's cell-phone location. Jana recalled that she had told Conway police about this tracking feature and that she had emailed a screenshot of the cell-phone location display for the date and time of the shooting. The application superimposed a blue circle over a satellite picture with identified streets. Within the circle was the location identified by previous witnesses as the site of the shooting. A copy of the screenshot was entered into evidence without objection. Jana testified that she volunteered the screenshot because she thought it would prove Thomas's innocence.

Andrea Hall testified that she was Thomas's live-in girlfriend at the time of the shooting. According to Hall, she was pregnant with Thomas's child and had asked him to take her to get something to eat. Thomas got a phone call from his ex-girlfriend, Kylie, and he was visibly angry. Thomas told her that he intended to make sure that Kylie was where she claimed to be, at the Stacey Motel. After checking, however, Thomas determined that Kylie was not at the motel. Hall told him she was tired and asked to go home, but Thomas spotted Mr. Givens's SUV. Hall recalled that Thomas approached the black SUV "aggressively." At a stop, the driver got out of the vehicle and exchanged words with

5

Thomas, which made him visibly angrier. Thomas chased the SUV, speeding to catch up with it. When he caught Mr. Givens's SUV, Thomas pulled Hall down in front of the seat. He then exchanged words with Mr. Givens and fired a single gunshot. Hall stated that she did not see the gun but definitely heard the shot. Thomas then sped away. Afterward, Thomas stated to Hall that he had not intended to shoot the driver of the other vehicle. Thomas also told Hall that he would kill her if she said anything about the shooting. She promised she would not say anything. Hall also testified that she subsequently gave a statement to police, and Thomas tried to get her to change her statement.

The State concluded its case with the Arkansas State Crime Laboratory medical examiner, Dr. Adam Craig. Dr. Craig testified that Mr. Givens died of a single gunshot wound that penetrated his brain at the left temple. He opined that given the characteristics of the wound, the shot was made at a distance greater than three feet and that the bullet passed through another object before penetrating Mr. Givens's skull.

At the close of the State's case, Thomas made the following motion for a directed verdict, stating in relevant part:[3]

> We move for a directed verdict on the charge of Capital Murder which requires proof of Sammie Thomas purposefully discharged a firearm from a vehicle at a vehicle he knew or had good reason to believe was occupied by a person; and, second, thereby caused the death of Mr. Givens under circumstances manifesting extreme indifference to the value of human life. We believe that the evidence [h]as shown that this was an accidental shooting

---

[3]This preserved Thomas's sufficiency argument on appeal. While not germane to this appeal, Thomas also moved for a directed verdict on the lesser-included offenses of "First Degree Unlawful Discharge of a Firearm from a Vehicle; "Second Degree Unlawful Discharge of a Firearm from a Vehicle;" and "Manslaughter."

6

and not a purposeful shooting, specifically the physical evidence that's been introduced through the photographs of Mr. Givens' car showing the angle of the bullet coming from various--I heard testimony much more than ninety degrees up to 120-140 degrees or--I think the pathologist said, you know, it was almost behind. Combine that with the testimony in the record that Mr. Thomas was wearing a cast, implying not able to purposefully discharge a firearm at a vehicle and then Andrea Hall's testimony of admissions that were made, that this was not purposeful conduct or had the intent to cause it. And then finally in the--under the circumstances manifesting extreme indifference to the value of human life element, the evidence would be the same and that as an accidental discharge there wouldn't be any evidence of showing that the circumstances manifested an extreme indifference to someone else's life.

The circuit court denied Thomas's directed-verdict motion. Thomas did not testify or put on any other evidence in his defense. The jury convicted Thomas as charged, and he timely filed a notice of appeal.

On appeal, Thomas argues that the evidence supports the defense's theory of the case that he did not intend to shoot Mr. Givens. He asserts that the "most likely" conclusion from this evidence is that, as he approached the vehicle from the left, he fumbled with the weapon as he raised it, and it went off accidentally. He points to Andrea Hall's testimony that, in the excited moments after, he told her that he did not mean to shoot Mr. Givens. Arguing further, he contends that it was "mere conjecture" that he acted purposely or that he manifested extreme indifference to the value of human life. Thomas additionally argues that the evidence is insufficient to prove that he acted knowingly or recklessly in discharging the weapon, and therefore, the lesser offenses should be dismissed as well.

When we review the denial of a directed-verdict motion challenging the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict. *Holly v.*

*State*, 2017 Ark. 201, 520 S.W.3d 677. That means that we consider only the evidence that supports the verdict and determine whether the verdict is supported by substantial evidence. *Id.* Substantial evidence is evidence of sufficient certainty and precision to compel a conclusion one way or the other and pass beyond mere suspicion or conjecture. *Id.*

The argument that Thomas makes on appeal, strictly speaking, does not comport with our standard of review. Accordingly, we must decline his invitation to reinterpret the evidence in the manner he recommends. We are simply tasked with viewing the evidence in the light most favorable to how the jury viewed it and rendered a verdict in accordance with that view.

Thomas does not dispute that he was extremely angry on the night in question or that his anger manifested in his encounter with Mr. Givens. He does not dispute that he pulled out a gun and raised that gun to point it at the vehicle that was occupied by Mr. Givens and Mr. Givens's daughter. Likewise, he does not dispute that the gun discharged. The forensic evidence demonstrated that the path of the bullet was directed toward Mr. Givens's vehicle. While it is *possible* that Thomas had some other reason for raising his gun, pointing it at Mr. Givens's vehicle, and pulling the trigger, it is the province of the jury to resolve any conflicts or inconsistencies in the evidence, determine what weight to give the evidence, and to reject or accept all or any part of it that it believes to be true. *Arnold v. State*, 2018 Ark. 343, 561 S.W.3d 727. While we are mindful of Hall's testimony that Thomas claimed he did not mean to kill Mr. Givens, under the relevant formulation of our capital-murder statute, an intent to kill is not required; the purposeful mens rea in the

8

statute refers only to the act of discharging a firearm. *Hardman v. State*, 356 Ark. 7, 144 S.W.3d 744 (2004).

We likewise find no merit in Thomas's argument that the extreme-indifference-to-the-value-of-human-life element of the statute was not proved beyond speculation and conjecture. The act of firing a gun into an occupied vehicle that was being driven down the road is sufficient to support the jury's verdict. *Price v. State*, 373 Ark. 435, 284 S.W.3d 462 (2008). We have defined circumstances manifesting extreme indifference to the value of human life as deliberate conduct that culminates in the death of another person. 373 Ark. at 439, 284 S.W.3d at 465–66. Accordingly, we affirm on this point. Having affirmed the sufficiency of the evidence on the count of capital murder, it is unnecessary for us to consider Thomas's argument concerning the lesser offenses.

## II. *Motion to Suppress*

On review of a circuit court's denial of a motion to suppress evidence, we conduct an independent inquiry based on the totality of the circumstances, evaluating findings of historical facts for clear error. *Wilson v. State*, 2014 Ark. 8. We give due weight to inferences drawn by the circuit court, and we will reverse the circuit court only if the ruling is clearly against the preponderance of the evidence. *Id.*

On December 11, 2017, Thomas filed a motion styled "MOTION TO SUPPRESS EVIDENCE FROM AT&T SEIZURE." In the motion, Thomas challenged the State's subpoena of AT&T phone records. He asserted that he had a reasonable expectation of privacy in the cell-phone data, that Officer Melissa Smith's affidavit failed to establish

9

probable cause, and that the warrant was fatally overbroad.

At the February 1, 2018 hearing on the motion to suppress, Officer Smith testified regarding how Thomas was developed as a suspect and how the cell-phone information and screenshot were obtained as evidence, as set forth above in Section I of this opinion. The parties also stipulated to entering the cellphone documents as exhibits for the hearing.

Based on this information, the circuit court denied Thomas's motion to suppress. First, the circuit court found that Thomas did not have a right to privacy in the CSLI because Jana Kelly retained the power under her phone plan to track the whereabouts of his phone. However, the circuit court also found that the warrant whereby the police obtained the CSLI was valid.

On appeal, Thomas argues that the State's acquisition of cell-phone data violated his right against unreasonable searches and seizures guaranteed by the state and federal constitutions. Citing *Carpenter v. United States*, 585 U.S.___, 138 S. Ct. 2206 (2018), he asserts that he has a reasonable expectation of privacy in cell-site-location information. He contends that the circuit court "erred in finding otherwise."

We need not address the circuit court's conclusion that Thomas did not have a reasonable expectation of privacy in the CSLI because the circuit court also denied Thomas's motion to suppress based on the validity of the warrant. Thomas has not challenged this alternative basis for the circuit court's ruling on appeal. When the circuit court bases its decision on two independent grounds, and an appellant challenges only one ground on appeal, we affirm without addressing either basis of the circuit court's decision.

*Fuson v. State*, 2011 Ark. 374, at 8, 383 S.W.3d 848, 854.

### III. *Rule 4-3(i)*

In compliance with Arkansas Supreme Court Rule 4-3(i), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to appellant, and no prejudicial error has been found.

Affirmed.

Special Justice TIFFANY MILLIGAN BROWN joins.

WOOD, J., not participating.