Cite as 2024 Ark. 21

# SUPREME COURT OF ARKANSAS
**No.** CR–22–590

| | | |
|---|---|---|
| | | **Opinion Delivered:** February 15, 2024 |
| KEVONCE EPHRIAM | | |
| | APPELLANT | |
| | | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT [NO. 60CR-20-1266] |
| V. | | |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE KAREN WHATLEY, JUDGE |
| | | |
| | | AFFIRMED. |

**COURTNEY RAE HUDSON, Associate Justice**

Appellant Kevonce Ephriam appeals from his conviction of capital murder for the death of his three-month-old son, Minor Child ("MC"). He received a sentence of life imprisonment without parole. For reversal, Ephriam argues that the State did not present sufficient evidence for capital murder. We hold that substantial evidence supported the capital-murder conviction, and we affirm.

The child primarily lived with his mother, Undrea Brown, but Ephriam would occasionally keep MC overnight. On Saturday, February 8, 2020, Brown left MC with Ephriam, and Ephriam gave Brown twenty dollars for child support. Brown planned to pick MC up on Monday, but she could not find a ride. She told Ephriam that she would get MC on Tuesday instead, which upset Ephriam. He demanded the twenty dollars back, but

she no longer had it. Ephriam told her that she could pick up MC when she returned his money.

Ephriam and Brown exchanged texts on Monday evening. The State introduced into evidence text messages in which Ephriam threatened to kill Brown. Brown testified that while the two were texting each other, she spoke with Ephriam over the phone and told him not to hurt MC. Ephriam responded, "I might." After that phone call, Brown texted Ephriam, "Heaven forbid you hurt my child or [I] will put the police in your life[.]" Ephriam responded a few hours later and told Brown, "[d]on't worry about coming. . . . You're not getting my son. . . . I got him from now on."

Around 8:00 a.m. Tuesday, Ephriam called Brown and told her that MC was not breathing. Ephriam performed CPR on MC, and Ephriam's mother called 911. When police arrived, MC was dead but still felt warm. The autopsy of MC revealed numerous injuries that had occurred within twenty-four hours before his death. MC had bruises to his head, forehead, face, neck, and tongue; abrasions to his nose and neck; a torn frenulum; fractured ribs and vertebrae; and hemorrhaging in the soft tissue along his spinal column and on his neck, abdomen, and chest.

The jury watched a recording of Ephriam's police interview. In it, Ephriam claimed that MC was fine when he went to bed Monday around 7:00 p.m. MC woke up around 4:00 a.m., and Ephriam gave MC a bottle and changed his diaper. Ephriam claimed that he then laid MC on his stomach in the bed beside him, and MC went back to sleep. Ephriam said that when he woke up around 8:00 a.m., MC was cold to the touch, and he performed CPR while his mother called 911.

Ephriam did not explain what caused MC's death, but he gave police his theories for some of MC's injuries. Ephriam stated that his attempt to remove mucus from MC's nose before putting him to bed might have caused the bloody nose. Ephriam claimed he could have fractured MC's ribs and injured his mouth while Ephriam was performing CPR. He denied injuring MC or causing his death, but he did admit that, shortly before MC's death, he had threatened to kill Brown and to harm MC.

The medical examiner, Dr. Forsyth, concluded that MC's cause of death was "blunt[-]force injury complicated by asphyxia due to external airway compromise." She testified that MC's compromised airway was likely caused by a pillow or hand being pressed over his nose and mouth area because the injuries could not have been caused by MC's rolling over into a soft mattress and not being able to breathe.

Dr. Karen Farst, a child-abuse expert, testified that the "totality" of MC's injuries could "only [have been] explained by an inflicted injury event[,]" not an accident. She testified that the type of rib fractures that MC had are caused when the front and back of the rib cage is "compressed" at the same time, which "common[ly]" happens when a person "gets frustrated and squeezes too hard." She explained that this type of injury is typically inflicted by a person's hands and not an object. Dr. Farst stated that the injury to MC's vertebrae was uncommon in young children and unlikely to have been caused by an accident. According to her testimony, this type of injury to an infant is most commonly caused by a "direct blow to the back of that area" or a person slamming the baby in a seated position, thereby causing the spine to collapse on itself. She explained that MC's fractured vertebrae could not have been caused by performing CPR.

3

Dr. Farst further testified that the abrasions to MC's nose could only have been caused by "a very aggressive kind of friction or rubbing-type of mechanism" and rubbing a runny nose would not have caused it. She explained that the multiple injuries to MC's head "would indicate that either there was a blow to the head or that the head was kind of propelled into something[.]" She stated that the tear in MC's mouth and the bruise to his tongue were "consistent with some type of compression against the face where the neck [was] kind of being used as an anchor." She testified that, due to these injuries, it was "more likely" that "the face was grabbed and then either the hand or something else was then pressed down on that area." Some type of "forceful either compression or mechanical obstruction over the baby's face" would be necessary to cause these injuries. Dr. Farst elaborated that when MC's airway was compromised, MC would have been fighting against it, "flailing . . . legs," "pushing back," and "trying to free [his] head[.]" She testified that it would have taken over 30 seconds for MC to stop struggling, but it would have taken additional time to cause death. Based on her expert opinion, Dr. Farst concluded that MC's death was not accidental but rather the result of physical abuse.

Based on the evidence presented, the jury found Ephriam guilty of capital murder. For his single point on appeal, Ephriam challenges the sufficiency of the evidence supporting his conviction. He argues that the State failed to prove that he "deliberately engaged in conduct that he actually knew was practically certain to result in [MC's] death." He argues that MC's death could have been accidental and that the jury had to resort to speculation and conjecture to determine that he knowingly caused MC's death under circumstances manifesting extreme indifference to the value of human life.

4

When reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Break v. State*, 2022 Ark. 219, 655 S.W.3d 303. We will affirm the conviction if substantial evidence, either direct or circumstantial, supports it. *Id.* Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion without resorting to speculation or conjecture. *Armstrong v. State*, 2020 Ark. 309, 607 S.W.3d 491. The jury assesses the credibility of witnesses, and it is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Howard v. State*, 2016 Ark. 434, 506 S.W.3d 843.

Ephriam was charged with capital murder. Specifically,

> [u]nder circumstances manifesting extreme indifference to the value of human life, the person knowingly causes the death of a person fourteen (14) years of age or younger at the time the murder was committed if the defendant was eighteen (18) years of age or older at the time the murder was committed.

Ark. Code Ann. § 5-10-101(a)(9)(A) (Supp. 2019). There is no dispute that MC was under fourteen and that Ephriam was older than eighteen. Arkansas Code Annotated section 5-2-202(2) states:

> A person acts knowingly with respect to: the person's conduct or the attendant circumstances when he or she is aware that his or her conduct is of that nature or that the attendant circumstances exist; or
>
> . . . [a] result of the person's conduct when he . . . is aware that it is practically certain that his . . . conduct will cause the result[.]

Ark. Code Ann. § 5-2-202(2)(A)–(B) (Repl. 2013). We have consistently defined circumstances manifesting extreme indifference to the value of human life as deliberate conduct that culminates in the death of another person. *Terry v. State*, 2020 Ark. 202, 600

5

S.W.3d 575; *Thomas v. State*, 2020 Ark. 154, 598 S.W.3d 41. We have also recognized that the requisite intent for capital murder can be inferred by the nature, extent, and location of the victim's wounds. *Smith v. State*, 2024 Ark. 1, 680 S.W.3d 711.

The State presented substantial evidence for the jury to conclude that Ephriam knowingly caused MC's death under circumstances manifesting extreme indifference to the value of human life. It is undisputed that MC died while he was alone with Ephriam. Dr. Farst testified that MC had bruises and abrasions to his head, face, and mouth; fractured ribs and vertebrae; and hemorrhaging in his back, chest, abdomen, and neck. She stated that MC's fractured ribs were likely caused by compressing the front and back of MC's ribcage together, and the injuries to MC's head occurred by someone either hitting his head with something or propelling it into something. She believed that MC's fractured vertebrae was the result of a direct hit to the vertebrae, or by someone forcibly slamming MC's body into a seated position. Dr. Farst testified that MC died as a result of someone placing a hand or a hard object over MC's mouth and nose with enough force to obstruct MC's airway and to cause injury to his mouth, tongue, and nose. She also detailed how MC would have been fighting for his life as he was suffocating. Dr. Farst concluded that MC's injuries were nonaccidental and were caused by an "inflicted injury event" or "physical abuse."

Ephriam admitted that shortly before MC's death, he had threatened to murder Brown and to hurt MC. Ephriam's explanations for MC's injuries were refuted by Dr. Farst and Dr. Forsyth. A jury does not lay aside its common sense in its evaluation, and it may infer a defendant's guilt from improbable explanations of incriminating conduct. *Green v. State*, 2013 Ark. 497, 430 S.W.3d 729. As a result, the jury reasonably concluded that MC's

injuries were not accidental, but that Ephriam murdered his own son. Accordingly, substantial evidence supports the verdict.

*Rule 4-3(a)*

In compliance with our rules, we have examined the record for all objections, motions, and requests made by either party that the circuit court decided adversely to the appellant. Ark. Sup. Ct. R. 4–3(a). No prejudicial error has been found.

Affirmed.

*Morris Law Firm*, by: *Jimmy C. Morris Jr.*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Brooke Jackson Gasaway*, Ass't Att'y Gen., for appellee.