Cite as 2024 Ark. 1
# SUPREME COURT OF ARKANSAS
No. CR–22–615

| | | |
|---|---|---|
| | | **Opinion Delivered:** January 18, 2024 |
| MARLON SMITH | | |
| | APPELLANT | |
| | | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72CR-19-1446] |
| V. | | |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE MARK LINDSAY, JUDGE |
| | | |
| | | AFFIRMED. |

**COURTNEY RAE HUDSON, Associate Justice**

Appellant Marlon Smith appeals his conviction in the Washington County Circuit Court for first-degree murder, for which he received a sentence of life imprisonment. For reversal, appellant argues that the circuit court erred by (1) failing to grant his motion for mistrial after a witness testified that he had been in prison and (2) failing to grant his motion for directed verdict on the basis of insufficient evidence. We affirm.

On May 29, 2019, the State filed a criminal information charging appellant with capital murder in connection with the death of Scott Kendricks, who was shot and killed on April 28, 2019. The jury trial was held on June 6–8, 2022, and the State presented the following evidence in support of the murder charge.

Nakita Blackburn, who was engaged to Kendricks at the time of the murder, testified that in the fall of 2018, Kendricks and appellant got into an altercation.[1] She stated that appellant had refused to leave her home and that the two men began fighting. Nakita indicated that at one point, Kendricks pinned appellant to the ground and began choking and punching him. After a brief separation, Kendricks then struck appellant with a bat. According to Nakita, appellant eventually left, but he returned to the house on several occasions over the next few weeks wanting to talk to Kendricks. On one of those occasions, appellant had a pistol in his hand, and Nakita told him that if he did not leave, she would call the police. She stated that she did not see appellant again until the night of April 28, when she gathered with Kendricks and other friends and family for a barbeque at the home of her grandmother, Loretta Blackburn. After Nakita arrived at the party and saw that appellant was there, she told him that he needed to leave. Later that evening, shortly after Nakita had left the party and gone home, she received a phone call and was told that Kendricks had been shot.

Katherine Smith testified that she also attended the April 28 barbeque. Appellant, Kendricks, Katherine, and her boyfriend, Chris Blackburn, were all outside the house talking, drinking, and smoking. Katherine stated that appellant left and then returned to the party a couple of times. Katherine testified that when appellant returned the last time, he drank a shot of brandy with her. He also attempted to buy some marijuana but decided that he did not like the way it looked. Katherine stated that appellant then shot Kendricks,

---

[1]Because several of the witnesses have the same last name, we refer to them by their first names and to Marlon Smith as appellant to avoid confusion.

walked to his car, and drove away. She testified that everyone had been getting along before the incident and that she did not know why appellant shot the victim. Afterward, Katherine stated that Kendricks was running down the street screaming and holding his neck. She attempted to calm him down and stop the bleeding while they waited for an ambulance. When the police arrived at the scene, Katherine admitted that she initially told them she did not know who had shot Kendricks. However, in her interview with the police the next day, she stated that she had told the truth about appellant committing the murder.

Chris Blackburn also testified to what he had witnessed on April 28. He stated that he was familiar with appellant, that he had known him a long time, and that he was aware of the previous altercation between appellant and Kendricks. Chris testified that on the day of the barbeque, he, Kendricks, and Katherine were "chilling, smoking, and drinking" outside when appellant returned to the party later that evening. Chris stated that after appellant engaged in a brief conversation with Kendricks, appellant "just up and shot him." Chris testified that he was pretty sure appellant was talking to Kendricks about some marijuana, but he did not see an argument between the two prior to the shooting. Chris could not remember what he told the police that night, but he informed them in his interview the next day that it was appellant who had shot Kendricks.

Casey Simon, one of Loretta's grandsons, testified that appellant was his best friend. Simon indicated that appellant and Kendricks had gotten into an altercation prior to the murder and that he got tired of appellant talking about it. Simon also attended the April 28 barbeque, although he left prior to the shooting. He stated that when he saw appellant and Kendricks at the party, they were not arguing and instead seemed to be getting along. After

3

appellant shot Kendricks, he came to Simon's home, smoked some marijuana, and ate some dinner. Simon testified that although appellant acted as if everything was normal at first, appellant later went to the back of the house and started yelling for him. When Simon went to talk to him, appellant told him, "I just put a bullet in Hot's brain."[2] Simon then received a phone call about the shooting, and he told appellant to leave. Simon testified that when appellant walked to the door, it looked like "all of his emotions drained out of his body like he recognized what it is that he just did. He looked at me, he walked back to me[,] and he gave me a hug because he knew right then that this was it."

Fayetteville Police Officer Dalton Frazier testified that he and another officer were the first to arrive on the scene after the shooting. Frazier stated that Kendricks was having trouble breathing and that at one point, he spit what appeared to be bone fragments out of his mouth. Frazier rode in the ambulance with Kendricks, and he testified that Kendricks lost consciousness on the way to the hospital. He was pronounced dead upon arrival.

Appellant was arrested for Kendrick's murder, and his shirt and jeans tested positive for gunshot residue. In his interviews with police, appellant denied shooting Kendricks or even owning a gun. Washington County Detention Center Deputy Dean Hejl testified that after appellant's arrest, another detainee was moved to appellant's jail cell due to overcrowding. Shortly afterward, Hejl heard banging on the cell door. He stated that he went to investigate and heard appellant yell, "I just blew a mother fucker's brains out and y'all are gonna put somebody in my cell?"

---

[2]Multiple witnesses testified that Kendricks was also known as "Hot" or "Too Hot."

Dr. Stephen Erickson, the medical examiner who performed an autopsy on Kendrick's body, testified that Kendricks died from a gunshot wound to his head. Dr. Erickson stated that the bullet entered near Kendrick's right ear lobe, exited under his left jaw, and reentered his left shoulder. He testified that, based on the powder stippling present around the entry wound, the shot was fired from a "can't miss" range of less than one foot. Although the bullet did not cause the neurological injury that is typically associated with a gunshot wound to the head, Dr. Erickson stated that it created a tremendous amount of hemorrhaging in the soft tissue of Kendrick's mouth and resulted in his suffocation due to the blockage of air to his lungs.

At the close of the prosecution's case, appellant moved for a directed verdict, arguing that the State had presented insufficient evidence of his intent to commit the murder. The circuit court denied this motion, as well as appellant's renewed motion for directed verdict. The jury acquitted appellant of capital murder but convicted him of first-degree murder. He received a life sentence. The sentencing order was entered on June 9, 2022, and appellant filed a timely notice of appeal.

On appeal, appellant argues that the circuit court erred by denying his motion for directed verdict. Specifically, he contends that the State failed to introduce sufficient evidence to prove that he had the necessary mental state to commit first-degree murder. Although he presents this as his second argument on appeal, we address appellant's challenge to the sufficiency of the evidence first due to double-jeopardy considerations. *Tucker v. State*, 2023 Ark. 69, 664 S.W.3d 428.

We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. *McCray v. State*, 2020 Ark. 172, 598 S.W.3d 509. In reviewing a sufficiency challenge, we assess the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Id*. We will affirm a judgment of conviction if substantial evidence exists to support it. *Armstrong v. State*, 2020 Ark. 309, 607 S.W.3d 491. Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Id*. The credibility of witnesses is an issue for the jury, not the court; the trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Howard v. State*, 2016 Ark. 434, 506 S.W.3d 843.

Pursuant to Arkansas Code Annotated section 5-10-102(a)(2) (Supp. 2019), a person commits first-degree murder if, "[w]ith a purpose of causing the death of another person, the person causes the death of another person[.]" A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. Ark. Code Ann. § 5-2-202(1) (Repl. 2013). We have stated that the purpose to commit a crime can be formed in an instant. *Armstrong, supra*. Intent is seldom capable of proof by direct evidence and must usually be inferred from the circumstances surrounding the murder. *Id*. The intent necessary for first-degree murder may be inferred from the type of weapon used, the manner of its use, and the nature, extent, and location of the wounds. *Halliburton v. State*, 2020 Ark. 101, 594 S.W.3d 856.

The State presented sufficient evidence in this case to prove that appellant purposely caused the death of Kendricks. Chris and Katherine both testified that they saw appellant pull out a gun, shoot Kendricks in the head, walk to his car, and then drive away. Neither Chris nor Katherine witnessed an argument between appellant and Kendricks on the evening of the murder, although the two men had been involved in a previous altercation. The medical examiner indicated that Kendricks was shot at a "can't miss" range, and gunpowder residue was found on appellant's clothing. Appellant also told Simon shortly after the murder that he had "just put a bullet in Hot's brain," and Hejl heard appellant yell, "I just blew a mother fucker's brains out" while appellant was detained in the Washington County jail. Although appellant argues that the evidence at the scene pointed to an attempted drug transaction gone awry, he does not explain how this scenario is inconsistent with the jury's conclusion that he purposely committed the murder. Appellant's flight from the scene of the shooting and his subsequent lies about his involvement in the crime to the police are also evidence of his purposeful intent. *See, e.g.*, *Atwood v. State*, 2020 Ark. 283 (stating that lying about a crime can indicate consciousness of guilt); *Gillard v. State*, 366 Ark. 217, 234 S.W.3d 310 (2006) (holding that flight is probative evidence of guilt). Accordingly, we hold that substantial evidence supports appellant's conviction for first-degree murder.

Appellant next argues that the circuit court erred by failing to grant his motion for a mistrial when a witness testified that appellant had been in prison. During appellant's cross-examination of the State's witness, Chris Blackburn, the following exchange occurred:

> Q: But he had been around this whole time in the months leading up to the shooting?

A:      Has he been around?
Q:      Yeah, was Marlon around?
A:      Naw, we didn't hang with Marlon like that.
Q:      I'm saying was he around the area: You heard—
A:      Yeah, he was somewhere around, running around, doing what he does.
Q:      Okay. You never really hung out with Marlon?
A:      No, not since we— not since he actually got out of prison the first time.

Appellant then objected and asked to approach the bench. He argued that he did not mean to elicit that response from the witness, but now that the jury had heard he had been in prison before, he had to move for a mistrial. The State responded that a mistrial was not necessary and that a curative instruction could resolve the issue. The circuit court agreed that a mistrial was not warranted but stated that it would instruct the jury to disregard the statement. The court asked appellant if he wanted the instruction given now or with the other jury instructions, and appellant indicated that he would like one at both times. The circuit court did not have the appropriate instruction at hand and elected to take a short recess to procure it. When the trial resumed, the record does not reflect that a curative instruction was ever given to the jury or that appellant renewed his request for one.

A mistrial is an extreme and drastic remedy that is appropriate only when there has been an error so prejudicial that justice cannot be served by continuing with the trial or when the fundamental fairness of the trial has been manifestly affected. *Thompson v. State*, 2019 Ark. 290, 586 S.W.3d 163. The decision to deny a mistrial is within the sound discretion of the circuit court, and its ruling will not be reversed in the absence of an abuse of discretion or manifest prejudice to the defendant. *Williams v. State*, 2011 Ark. 432, 385 S.W.3d 157. In determining whether a circuit court abused its discretion by denying a motion for mistrial, we consider factors such as (1) whether the prosecutor deliberately

induced a prejudicial response and (2) whether an admonition to the jury could have cured any resulting prejudice. *Thompson*, *supra*. An admonishment or limiting instruction will usually remove the effect of a prejudicial statement unless the statement is so patently inflammatory that justice could not be served by continuing the trial. *Williams*, *supra*. The defendant bears the burden of requesting an admonition sufficient to cure the prejudice, and the failure of the defense to request an admonition may negate the mistrial motion. *Id.*

Here, the defense—not the prosecution—elicited the testimony that appellant had previously been in prison. Furthermore, although the circuit court offered to give a curative instruction to the jury, appellant failed to ensure that such an instruction was given. We have held that a singular reference to a defendant's prior trial or prison sentence is not so prejudicial that it warrants a mistrial. *E.g.*, *Williams*, *supra* (affirming circuit court's denial of a mistrial where witness referred to defendant's previous trial); *Kimble v. State*, 331 Ark. 155, 959 S.W.2d 43 (1998) (holding that testimony about defendant previously being in prison was not so injurious that a mistrial should have been granted). Although appellant cites *Moore v. State*, 323 Ark. 529, 915 S.W.2d 284 (1996), and *Green v. State*, 365 Ark. 478, 231 S.W.3d 638 (2006), wherein we reversed the circuit court's denial of a mistrial, both of these cases are clearly distinguishable. In *Moore*, the witness testified that the defendant had admitted to another murder. Similarly, in *Green*, the witness made several remarks about a prior incident involving the theft of marijuana plants from the defendant and her fear of the defendant due to the mysterious death of one of the thieves shortly afterward. The testimony at issue here simply does not rise to the level of prejudice involved in either *Moore* or *Green*. Thus, the

circuit court did not abuse its discretion in denying appellant's motion for a mistrial, and we affirm on this point as well.

*Rule 4-3(a) Review*

Because appellant received a life sentence, the record has been examined for all objections, motions, and requests made by either party that were decided adversely to appellant in compliance with Arkansas Supreme Court Rule 4–3(a), and no other prejudicial error has been found.

Affirmed.

*David M. Hogue*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Jacob H. Jones*, Ass't Att'y Gen., for appellee.