Cite as 2024 Ark. 77

# SUPREME COURT OF ARKANSAS

**No.** CR–23–710

| | |
|---|---|
| | **Opinion Delivered:** May 9, 2024 |
| JACOVAN BUSH | APPEAL FROM THE PULASKI |
| APPELLANT | COUNTY CIRCUIT COURT |
| | [NO. 60CR-20-708] |
| V. | |
| | HONORABLE CATHLEEN V. |
| STATE OF ARKANSAS | COMPTON, JUDGE |
| APPELLEE | |
| | AFFIRMED. |

**COURTNEY RAE HUDSON, Associate Justice**

Appellant Jacovan Bush appeals from his convictions of capital murder, aggravated residential burglary, aggravated robbery, and theft of property. He received sentences of life imprisonment without parole, plus forty years in the Arkansas Division of Correction (ADC). For reversal, Bush argues that (1) the circuit court erred in denying his motion in limine to exclude improper expert testimony, and (2) the circuit court erred in denying Bush's motion for a directed verdict because there was insufficient evidence to sustain his convictions. We hold that the circuit court did not abuse its discretion and that there was substantial evidence to support the convictions; therefore, we affirm.

On February 15, 2018, men broke into twenty-three-year-old Devon Howard's apartment and ultimately killed him. As a result, Bush was arrested on January 23, 2020, after his blood came back as the DNA match from the samples found in Devon's apartment. Just before the scheduled trial date, the State informed the defense that Officer Miranda

Dollar, a crime-scene specialist with the Little Rock Police Department Crime Scene Search Unit, disclosed an opinion about the blood evidence that was not contained in her reports. Officer Dollar's opinion was that a specific sample of blood on the kitchen countertop was fresh when she arrived but had dried before law enforcement finished clearing the scene. The core of Bush's defense was that when law enforcement located the blood stains, they were dry, so the blood must have been shed prior to Devon's murder. Based on Officer Dollar's new statement, Bush moved in limine to preclude her from testifying at trial. The circuit court heard testimony on the issue at a hearing on February 9, 2023. At the close of Officer Dollar's testimony, the court heard arguments from both parties. A few days later, the circuit court entered a written order denying the motion. The case proceeded to jury trial on March 28, 2023.

At trial, the State presented several witnesses. Ericka Criswell, Devon's high school friend, recounted that Devon had recently moved into his apartment in Little Rock. On February 15, 2018, his cousin, Tiana Howard, and her two young children came to the apartment with Ericka. While the group was together in a bedroom with an air mattress and a television, they heard a loud knocking sound over the music playing on the television. Devon went to the door. Tiana and Ericka then heard a "scuffle." Ericka testified that Tiana peeked out of the bedroom and said, "They're trying to come in. They're trying to take something." The women grabbed the children shortly before a man entered the bedroom and waved a gun at them. The women screamed, put the children behind them, and ran to the bathroom connected to the bedroom. The man left the bedroom at some point but then returned and kicked the bathroom door in, demanding, "Where is the fucking money?"

2

while pointing a gun at Ericka's face. Ericka heard footsteps, body movements in the living room and kitchen area, and cabinets being opened while the man was still in the room with the women and the children. The man left the bathroom. However, Ericka could not hear Devon at all during this. Ericka testified that, at one point, the man with the gun came into the room and said he was going to "blow [their] fucking heads off" if they did not tell him where the money was. Ericka testified that Tiana said she would help him look. She heard the man tell Tiana that he was not playing and that he wanted the money. Ericka said they did not know what he was talking about, and Tiana kept begging him not to kill them.

After helping the man look for the money throughout the apartment, unsuccessfully, Tiana returned to the bathroom with blood running from her head to her face. Ericka testified that the injury was not there before Tiana left the bathroom with the armed man. Ericka testified that things got quiet, and as the men were exiting the apartment, she heard one gunshot. Tiana and Ericka then found Devon lying face down on the floor with a hole in his back. He was dead by the time paramedics arrived.

Ericka testified that she saw no blood in the apartment prior to Devon's murder. She also testified that the men had taken Tiana's and Ericka's phones as they had left them on the air mattress in the bedroom, but the phones were gone when Tiana and Ericka came back through the bedroom. They had no way to call 911 to report the burglary and shooting, so they asked a neighbor to call 911 for them.

Next, the State presented Officer Dollar. She testified that the time-gap between the first and second photos of the blood in exhibit numbers 15 and 16 was between thirty minutes and one hour. She testified that in the second photograph, exhibit no. 16, the blood

3

looked "much darker. . ." and that it "had peeled up off the countertop, and it was basically a solid." She opined that "[t]he blood drop itself appeared to have dried over that course of time."

On cross-examination, Officer Dollar admitted that she had previously testified that the time-gap between the photos was between three and four hours. When pressed on this inconsistency, she admitted that she did not have actual knowledge about the time-gap between the first and second photographs. Additionally, she acknowledged that everything depicted in the second photograph was darker—not just the blood. Officer Dollar attributed the differences in the photographs to the camera.

Officer Kevin Duncan then testified that when he arrived, Tiana and Ericka were crying and seemed to be very upset. He noticed the smell of marijuana and empty glass jars with marijuana and marijuana residue. He found a ".22 long rifle round on the counter" and several boxes of clear sandwich bags. He observed that all the cabinet doors in the kitchen were open as well as the refrigerator and freezer doors.

Detective Rick Harmon testified next. He had become the lead detective on this case in 2020 after the previous detective transferred to another unit. He testified that Bush became a suspect when Harmon received a CODIS letter—a nationwide database of DNA profiles—that the blood samples submitted matched Bush's genetic profile. As a result of the DNA hit, he sought an arrest warrant for Bush.

The state then presented Dr. Adam Craig, an associate medical examiner who works as a forensic pathologist. Dr. Craig testified that the autopsy conducted revealed that Devon died from a single gunshot wound to his back that exited through his chest. He testified that

4

the nature of the wound indicated that the gun must have been fired from within three feet of Devon. Dr. Craig testified that Devon had abrasions on his right elbow as well as a broken nose. Devon also had a laceration with contusion on his left cheek.

Karyn Terry, a chemist who was a forensic serologist at the crime lab at the time of Devon's autopsy, received the samples for testing from this case. She tested for blood on the swabs. All but one sample submitted was identified as blood. Maddison Harrell was a forensic DNA analyst at the crime lab when the blood samples arrived, but he has since left the crime lab. He testified that the DNA from the blood samples matched Bush's genetic profile "within all scientific certainty." He testified that sample degradation can occur from several factors, including cleaning agents, the actual surface it was imbedded in, sunlight, and time. He also testified that slight degradation does not substantially change his opinion.

After the State rested, Bush moved for a directed verdict on all counts, which the circuit court denied. At the close of all evidence, Bush renewed his motion for a directed verdict, which the circuit court again denied. The jury found Bush guilty on all counts, and the circuit court imposed an aggregate sentence of life imprisonment without parole, plus an additional forty years. Bush now appeals.

Bush argues that the circuit court erred by denying his motion for directed verdict because there was insufficient evidence to convict him of capital murder. We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *McCray v. State*, 2020 Ark. 172, 598 S.W.3d 509. Although Bush challenges the sufficiency of the evidence in his last point on appeal, we must address it first for purposes of double jeopardy. *Armstrong v. State*, 2020 Ark. 309, at 5, 607 S.W.3d 491, 496. We have repeatedly held that in reviewing

a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Id.* We affirm a conviction if substantial evidence exists to support it. *Mabry v. State*, 2020 Ark. 72, 594 S.W.3d 39. Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Rickert v. State*, 2023 Ark. 191, at 5–6. The credibility of witnesses is an issue for the jury, not the court; the trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.* at 6.

Bush argues that the presence of DNA at the scene is insufficient evidence because the witnesses did not identify him, and the blood could have been dry when Officer Dollar arrived and took pictures of the scene. This court, however, has consistently accepted DNA evidence as sufficient proof of guilt. *Ellis v. State*, 364 Ark. 538, 543, 222 S.W.3d 192, 196 (2006); *Arnold v. State*, 2018 Ark. 343, at 4, 561 S.W.3d 727, 729. Even though this court has held that DNA evidence is sufficient to support a verdict, Bush points to *Lewis v. State,* 2010 Ark. 209, to support his argument that that our decisions have always pointed to other facts to support the finding of sufficient evidence and the DNA evidence is the only evidence to support Bush's conviction.

In *Engram v. State*, however, this court held that "the DNA evidence [was] substantial standing alone." 341 Ark. 196, 202, 15 S.W.3d 678, 681 (2000). Additionally, here, multiple swabs were taken from the apartment, tested, and determined to have DNA that matched Bush's DNA profile "within all scientific certainty." Regarding questions of credibility, as

stated above, we view the evidence in the light most favorable to the State, recognizing that it is the jury's province to resolve credibility disputes and not our own. *Id*. This principle applies to DNA evidence when its credibility is being challenged. *Id*. Combined with testimony that the swabbed blood matching Bush's DNA was initially wet, the jury as factfinder could have reasonably concluded that Bush was in the apartment around the time Devon was murdered and was the one who attacked and shot Devon, or at least was a party to it. As such, the circuit court properly denied Bush's motions for directed verdict, and under our standard of review, we hold that substantial evidence of his guilt exists.

Bush also argues on appeal that Officer Dollar's testimony was inadmissible under Arkansas Rule of Evidence 701 because an opinion on the physical change of the blood falls outside the scope of lay-person testimony. Bush filed a motion in limine to preclude Officer Dollar's testimony that blood, later identified as Bush's, was fresh when initially found in the apartment but had dried between the time she took two sets of photographs at the crime scene. At the hearing on the motion in limine, Officer Dollar testified that she arrived at the crime scene around 8:30 p.m., met with other responding officers, conducted an initial walkthrough of the property, photographed the blood stains twice, and then collected swabs for the Arkansas State Crime Laboratory. Regarding the specific sample at issue, she testified that the blood appeared to have dried between the first and the second photographs, which was "three to four hours." She explained that she noticed the blood had dried when she initially took the sample, but she did not include it in her report because she lacked training on the issue. She also explained that she arrived at her opinion about the blood after she had reviewed the two photos of the specific sample. Specifically, Officer Dollar testified:

> It did not necessarily appear to me on the first observation that it was very wet or very fresh. I might not have noted that it was in particular fresher than any of the other stains. But upon viewing it later[,] and seeing how it had changed[,] and had become darker and misshapen, that led me to relook at both photos and see that, 'oh it must have been fresher at that time.'

On cross-examination, Officer Dollar testified that she is not an expert in blood evidence, but since taking the sample, she has taken two courses about blood evidence for a total of sixty-eight hours. The circuit court eventually denied the motion in limine.

Arkansas Rules of Evidence 701 and 702 govern opinion testimony. Lay witnesses may provide opinion testimony when the opinion is "rationally based on the perception of the witness; and the opinion is helpful to a clear understanding of his [or her] testimony or the determination of a fact in issue." Ark. R. Evid. 701. Expert witnesses may provide opinion testimony "if scientific, technical, or specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Ark. R. Evid. 702.

Bush argues that the circuit court should have granted his motion in limine to exclude Officer Dollar's improper expert testimony. However, a circuit court has broad discretion when making evidentiary rulings, and this court will not reverse the court's ruling absent an abuse of discretion. *Humphry v. State*, 2023 Ark. 16, at 5, 659 S.W.3d 691, 695. Abuse of discretion is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *Id.*

Bush concedes that an expert witness is not required to identify blood. *See, e.g., Smith v. State*, 282 Ark. 535, 540, 669 S.W.2d 201, 205 (1984); *see also Leach v. State*, 2012 Ark. 179, at 18, 402 S.W.3d 517, 529 (testimony that a defendant had blood on his hands was

admissible because the opinion was based on the officer's personal experience as a law-enforcement officer and the opinion was rationally based on his personal observations). Bush argues, however, that the chemical and physical changes to a forensic blood sample that may or may not occur over time falls outside the scope of ordinary lay-opinion testimony. He claims that this information would require specialized scientific education and training, which Officer Dollar did not have. Bush provides no authority that expert testimony was needed to establish that a physical change had occurred, or more specifically, that blood had dried. When an appellant fails to cite convincing legal authority, this court will not reach the merits of the argument. *Bunch v. State*, 344 Ark. 730, 739, 43 S.W.3d 132, 138 (2001).

This court has consistently ruled that an officer's opinion testimony based on his or her work experience and observations is admissible. *E.g.*, *Flowers v. State*, 373 Ark. 127, 132, 282 S.W.3d 767, 771 (2008)(testimony of an officer that a truck's window had been broken on the outside did not require expert testimony because the officer's testimony was rationally based on his experience, forensic training, and personal observation); *Robinson v. State*, 353 Ark. 372, 383, 108 S.W.3d 622, 629 (2003) (opinion testimony by an investigator on the amount of blood lost by a victim was rationally based on perception and was admissible); *Gruzen v. State*, 276 Ark. 149, 155, 634 S.W.2d 92, 95 (1982) (opinion testimony by an officer on how long a person had been dead was admissible because it was based on the officer's experience and observations). Officer Dollar testified that the blood on the counter went from being "fresher" to "dried." Her testimony about those physical changes could have been given by any lay person, and she used photographs to show the differences between earlier photos and later photos of how the blood looked.

Bush effectively cross-examined Officer Dollar on her analysis of the blood changes as well as her seemingly inconsistent statements about the time between photos and why she only recently stated that the blood was "fresher" when she had previously indicated no such thing. This court has made it patently clear that the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Brooks v. State*, 2016 Ark. 305, at 7, 498 S.W.3d 292, 296. Officer Dollar further testified that she had been to approximately 1700 crime scenes over her eight years of experience, more than half of which contained blood. Although Bush thoroughly impeached the witness, the jury was free to determine how much weight to give Officer Dollar's testimony. *Id*. The circuit court did not abuse its discretion in allowing the testimony because the court determined that Dollar's opinion was rationally based both on her experience as a crime-scene specialist and her observation of the crime scene and its photographs. *Flowers*, 373 Ark. at 128, 282 S.W.3d at 769. As such, the circuit court did not abuse its discretion by denying Bush's motion in limine and admitting Officer Dollar's testimony.

*Rule 4-3(a)*

In compliance with Arkansas Supreme Court Rule 4–3(a), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to appellant, and no prejudicial error has been found.

Affirmed.

*James Law Firm*, by: *William O. "Bill" James* and *Drew Curtis*, for appellant.

*Tim Griffin*, Att'y Gen., by: *A. Evangeline Bacon*, Ass't Att'y Gen., for appellee.

10