Cite as 2025 Ark. 129

# SUPREME COURT OF ARKANSAS

**No.** CR–23–656

| | | |
|---|---|---|
| | | **Opinion Delivered:** September 25, 2025 |
| KEENAN HUDSON | APPELLANT | |
| V. | | APPEAL FROM THE ARKANSAS COUNTY CIRCUIT COURT [NO. 01SCR–19–25] |
| STATE OF ARKANSAS | APPELLEE | HONORABLE DONNA GALLOWAY, JUDGE |
| | | AFFIRMED. |

**COURTNEY RAE HUDSON, Associate Justice**

Appellant Keenan Hudson appeals his capital-murder conviction in the Arkansas County Circuit Court. He received a sentence of life imprisonment without the possibility of parole, plus a fifteen-year firearm enhancement. For reversal, Hudson argues that (1) the evidence supporting his conviction was legally insufficient; (2) the circuit court erred by not suppressing his in-custody statements; and (3) the record could not be settled and remains insufficient for our review. We affirm.

On February 19, 2019, Hudson was charged with one count of capital murder in connection with the death of Zyrique "Zack" Geans on February 13, 2019. The criminal information also alleged that Hudson was a habitual offender and that he was subject to a sentence enhancement for using a firearm during the commission of the offense. The

criminal information was later amended to add a charge of possession of a firearm by a felon; however, this charge was severed prior to trial and then nolle prossed by the State.

Hudson's jury trial was held on January 24–27, 2023, and the State presented the following evidence in support of the charges. The victim's brother, Akilli Geans, testified that on the afternoon of February 13, 2019, he was sitting with acquaintances behind a trailer at the corner of Porter and Lincoln Streets in Stuttgart, Arkansas. He left to go to a convenience store, and when he returned, he learned that his brother and Hudson had gotten into an altercation. Akilli then saw Hudson walking up the street holding a black handgun. Hudson got into a purple Chevrolet Camaro convertible driven by his brother, Chyvontae Powell, and they drove off. Akilli asked Ellis Berry to drive him to Akilli's grandmother's, Wilma Bradford's, house to check on his brother, Zack, who resided there. As they approached Bradford's Cleveland Street residence, Akilli noticed the purple Camaro a couple of car lengths behind them. Akilli testified that when he and Berry stopped at the stop sign at the intersection of Cherry and Cleveland Streets, he looked in the rearview mirror and saw Hudson standing up in the vehicle and shooting his gun toward Bradford's house. Akilli stated that Zack was underneath the carport of the home at this point and was not shooting. Akilli testified that he and Berry sped off as Hudson began firing his gun and that he heard shots from an automatic weapon a few seconds later. Akilli stated that Zack then called him and told him that Hudson had shot him. Zack passed away shortly afterward.

Berry's testimony was consistent with Akilli's. Berry stated that after he and Akilli pulled up to the trailer at Porter and Lincoln that afternoon and heard about the altercation between Zack and Hudson, he saw Hudson "fly past with his brother with a gun, saying,

2

Let's handle this. Let's go handle this." Berry testified that Hudson was a passenger in his brother's Camaro at the time Berry heard this. Berry and Akilli then drove toward Bradford's house on the east side of town and saw the Camaro behind them. When Berry stopped at the stop sign at Cherry and Cleveland, he stated that he heard gunshots and saw Hudson shooting toward Bradford's house. Berry testified that he did not hear any other gunshots prior to seeing Hudson fire his gun.

Ronta Ross testified that he was sitting in his car outside the trailer at Porter and Lincoln on February 13, 2019, when Hudson got into the passenger side. Ross stated that several minutes later, Zack came up and struck Hudson with a gun. Ross indicated that Hudson and Zack scuffled for a minute and that the two then went their separate ways. Ross testified that he went inside the trailer to get a snack, and when he came back out, he saw Hudson driving off with his brother in the Camaro.

Dwight Hood, who lives at the corner of Cleveland and Cherry, testified that he was outside cleaning his truck on the afternoon of February 13, when he heard two gunshots coming from the direction of Cherry Street, followed by gunfire from an automatic weapon. He was not able to see who was shooting. He then saw two groups of people running, one near Bradford's house and one farther down past the stop sign on Cherry Street. Patrick Mills, another neighbor, also testified that he heard two gunshots that afternoon, followed seconds later by additional gunfire. When Mills stepped outside after hearing the first two shots, the Camaro was at the stop sign at the corner of Cherry and Cleveland, and he saw Hudson shooting out of the car.

Mark Duke, who was a lieutenant with the Stuttgart Police Department at the time of the murder, testified that he responded to the scene of the shooting and found the purple Camaro, which had been rendered disabled due to gunfire, sitting on Cherry Street south of the intersection with Cleveland Street. Hudson and Powell were standing outside the vehicle. Duke noticed a trail of empty shell casings starting in the vehicle and leading north on Cherry past the Cleveland Street intersection. Additional shell casings were discovered in the driveway of Bradford's home and near a deck in her yard, and Duke stated that the wall and the floor of the carport contained blood spatter from the murder victim.

Criminal Investigator Jeremiah Richard testified as to the location and type of shell casings that were found at the scene. The fourteen shell casings found in and along the path of the Camaro were 9mm in caliber, and most of these were radically invasive projectile, or "RIP" bullets, which are designed to fragment on impact to maximize damage. Richard stated that the four shell casings in the driveway were also 9mm caliber but from a different manufacturer than those found near the Camaro. The third group of shell casings near the deck of the residence were 7.62x36mm bullets, which are consistent with bullets fired from an AK-47 rifle. No weapon was found in the Camaro, but Richard testified that a Taurus pistol and an AK-47 rifle were recovered outside Bradford's residence. The examination of the Camaro revealed multiple bullet holes on the front hood and passenger side, and nine of the 9mm shell casings were found inside the vehicle, primarily in the backseat area. Richard interviewed Hudson following the shooting, and Hudson denied possessing or shooting a gun during the incident.

Dr. Adam Craig, the forensic pathologist, testified that the victim died from a gunshot wound to the abdomen that perforated the aorta and that he recovered bullet fragments consistent with an RIP bullet. The firearm and toolmark examiner, Zachery Elder, testified that the 9mm. shell casings found in the Camaro and on Cherry Street were all fired from the same handgun, that the second group of 9mm shell casings found in Bradford's driveway were all fired from a different handgun, and that the shell casings found near the deck of the residence were all fired from the same rifle. Angela Evans, the forensic criminologist, testified that Hudson's clothing contained gunshot residue. In addition, samples from the rear passenger seat and the passenger-side headrest also tested positive for gunshot residue.

The defense claimed that the murder was justified and presented testimony from two witnesses in support of the affirmative defense. Tony Robinson testified that on the day of the shooting, he was driving home from work to his residence on Cleveland Street. As he approached Cleveland Street, there was an SUV in front of him, and a male passenger got out of the back seat of the SUV, waved a gun, and told him to go around. After arriving at his home, Robinson saw another passenger, whom he identified as Zack, exit the SUV and go into Bradford's yard. Robinson testified that he then heard gunshots coming from the direction of Hood's residence at the corner of Cleveland and Cherry Streets. Robinson stated, however, that he could not determine who, or how many, were firing weapons.

Hudson testified that on the afternoon of February 13, 2019, he walked to Porter Street and got into Ross's car to talk to him. After several minutes, Hudson stated that Zack came up from behind him and "pistol-whipped" him four or five times on the right side of

5

his head. Hudson testified that he got out of the car and that Zack then cocked his gun and put it in Hudson's face. Hudson indicated that he fled into a nearby alley, and after he returned to Porter Street to check on Ross, he got into the car with his brother, who happened to be driving by. According to Hudson, the two of them drove around and listened to music. When they approached the intersection of Cleveland and Cherry Streets, they saw individuals with guns in Bradford's yard. Hudson testified that he heard a machine gun begin firing at them and that he and his brother took cover. Hudson stated that, after realizing that their vehicle was disabled, he took his pistol, stuck it out of the open convertible top of the car, and fired it in the direction of the shooters. Hudson testified that once the gunfire ceased, he and his brother pushed the car down the road and waited for the police. Hudson admitted that he was the only person in the car who fired a gun and that all of the shell casings in the road were from his gun. He explained that he had initially denied possessing or shooting a gun in his statements to police because he was not supposed to have a firearm as a felon. Hudson indicated that he had thrown his gun into a nearby vacant lot before the police arrived. He denied that he and his brother had intentionally driven toward Zack's residence, claiming that he did not know where Zack lived. He also denied knowing that he had shot anyone.

At the conclusion of the trial, the jury found Hudson guilty of capital murder and of using a firearm to commit the offense. The circuit court imposed a sentence of life without parole for the murder and a fifteen-year firearm enhancement, to be served consecutively. The sentencing order was entered on February 8, 2023, and Hudson filed a timely notice of appeal.

We first address Hudson's argument that the evidence supporting his conviction was legally insufficient.[1] A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Bush v. State*, 2024 Ark. 77, 687 S.W.3d 570. On appeal, the sufficiency of the evidence is tested to determine whether the verdict is supported by substantial evidence, direct or circumstantial. *Brooks v. State*, 2016 Ark. 305, 498 S.W.3d 292. Substantial evidence is that which is of sufficient force and character to compel a conclusion one way or the other beyond suspicion or conjecture. *Id.* In determining whether there is substantial evidence to support the verdict, this court reviews the evidence in the light most favorable to the State and considers only that evidence which supports the verdict. *Bush*, *supra*. The credibility of witnesses is an issue for the jury, not the court; the trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Smith v. State*, 2024 Ark. 1, 680 S.W.3d 711.

As charged in this case, a person commits capital murder if he or she "[p]urposely discharges a firearm from a vehicle at a person or at a vehicle, conveyance, or a residential or commercial occupiable structure that he or she knows or has good reason to believe to be occupied by a person" and "[t]hereby causes the death of another person under circumstances manifesting extreme indifference to the value of human life." Ark. Code Ann. § 5-10-101(a)(10) (Repl. 2024). In his initial motion for directed verdict at trial, Hudson argued that the State had failed to prove that Hudson was the one who shot the victim or

---

[1]Although Hudson lists this argument as his third point on appeal, we address the sufficiency of the evidence first due to double-jeopardy concerns. *E.g.*, *Taffner v. State*, 2018 Ark. 99, 541 S.W.3d 430. Also, for ease of discussion, we address Hudson's allegation regarding the insufficiency of the record last.

that the victim was in an occupiable structure when he was shot. When he renewed his directed-verdict motion at the close of all the evidence, Hudson additionally cited his own testimony that he had fired his gun only after first being fired upon. The circuit court denied both motions.

Hudson now contends on appeal that the evidence was legally insufficient because it failed to establish that he shot and killed the victim. He also argues that the State failed to show that he did so with the conscious object to cause the victim's death and that such intention was formed before he acted. Hudson's arguments are either not preserved or without merit.

The State clearly presented substantial evidence to show that Hudson discharged his firearm at Zack and caused his death. Three separate eyewitnesses testified that they saw Hudson shooting his gun out of the Camaro toward Bradford's residence and Zack, who was in the carport. Although Hudson argues that these witnesses were all lying, this was an issue of credibility for the jury to resolve. *Smith*, *supra*. The physical evidence was also consistent with the eyewitness testimony. The trail of 9mm bullet casings behind the vehicle, as well as the casings found inside the vehicle, were all found to have been fired from the same weapon. The majority of these shell casings were from a specific type of bullet, an RIP bullet, which was the same type of bullet that was lodged inside the victim. Hudson's clothing and two samples from the back seat of the Camaro tested positive for gunshot residue, and he admitted that he was the only person in the vehicle that fired a gun.

Hudson claims that the facts in this case are similar to those in *Thornton v. State*, 2014 Ark. 157, 433 S.W.3d 216. *Thornton* is readily distinguishable, however, as we reversed the

defendant's conviction in that case based on insufficient evidence that he had acted with premeditated and deliberate intent. No such intent is required for the formulation of capital murder with which Hudson was charged. Rather, we have held that the purposeful mens rea in section 5-10-101(a)(10) refers only to the act of discharging a firearm. *Thomas v. State*, 2020 Ark. 154, 598 S.W.3d 41. Furthermore, Hudson's argument regarding his intent to commit the crime is not preserved for our review, as he did not raise it in his directed-verdict motions below. *See, e.g.*, *Haynie v. State*, 2025 Ark. 46, 709 S.W.3d 46 (holding that a defendant is bound by the scope and nature of the directed-verdict motions at trial and cannot change the grounds on appeal). Similarly, to the extent that Hudson is challenging the jury's rejection of his justification defense, that argument is also not preserved. Accordingly, we affirm Hudson's conviction.

Hudson next argues that the circuit court erred by denying Hudson's motion to suppress his statements to police. Prior to trial, Hudson filed a motion to suppress any statements that he had made to law enforcement, claiming that any such statements were involuntary and inadmissible. At the August 16, 2021 hearing on the motion to suppress, Richard testified that he conducted initial and follow-up interviews with Hudson on the evening of February 13, 2019. Richard stated that he advised Hudson of his *Miranda* rights prior to questioning him, both verbally and in writing. Richard then had Hudson place his initials indicating that he understood each of his rights on the statement-of-rights form. Hudson signed the form, which was introduced into evidence, and agreed to be interviewed. Richard was questioned as to whether he recalled Hudson being injured at the time of the interview as a result of being struck on the head with Zack's pistol. Richard

9

testified that he did not remember the injury and that he did not recall anything that would have impaired Hudson's ability to speak, give a statement, or think clearly.

The State then played the initial portion of Hudson's videotaped statement to show the reading of his *Miranda* rights, the conversation about him being hit with the pistol, and that Hudson did not appear to be suffering from any physical infirmities. In this recording, Hudson starts out by asking if the mark on his head is noticeable, and Richard indicates that he can see it. Hudson explains that he had been trying not to go to sleep, and Richard agrees that if Hudson had a concussion, it would be a bad idea for him to sleep. Richard then states that the injury does not look that bad. Later in the interview, Hudson discusses being struck by Zack with his pistol. One of the other officers asks where Hudson was hit, and Hudson points out the injury. Richard states that he had already taken a picture of it and that Hudson had "a pretty good knot" and small laceration earlier. However, Richard noted that the injury was not as pronounced at that point.

Defense counsel questioned Patricia Snyder, the jail administrator at the detention center where Hudson was held, about whether Hudson had continued to complain about his head injury after his arrest. Snyder stated that Hudson had asked to see a doctor after he arrived at the jail and had been advised to see the doctor on staff. Snyder indicated that, after an initial visit or two, Hudson refused to seek additional treatment through that doctor and had refused to take additional doses of medication that had been prescribed.

The State also presented testimony regarding another video recorded interview that was conducted with Hudson on November 18, 2019, after Hudson had been appointed counsel. Detective Shawn Watson stated that Hudson had requested to speak with law

enforcement and that he went to the jail to see him. Watson testified that he again advised Hudson of his *Miranda* rights and had him sign another statement-of-rights form. Watson prepared an additional document advising Hudson of the dangers and disadvantages of giving a statement without his attorney present, and Hudson signed this form as well, indicating that he still wished to speak with Watson. The State again played a portion of this recorded statement to show the warnings given to Hudson. The waiver forms that Hudson signed were also introduced into evidence.

At the conclusion of the hearing, the parties agreed that copies of the recorded statements would be provided to the circuit court for its review before it ruled on the motion to suppress. The parties also filed posthearing briefs. Hudson argued in his brief that his February 13 statements to Richard should be suppressed because any waiver of his rights was not voluntary, knowing, or intelligent in light of his head injury. Hudson also asserted that his November 18 statement should be suppressed because his counsel was not informed of, or present for, that interview. The circuit court entered an order denying Hudson's motion to suppress on October 15, 2021.

The State did not play the video-recorded statements for the jury or introduce them into evidence at Hudson's trial. However, Richard referred to the February 13 interviews during his testimony when he stated that, contrary to Hudson's current claim of self-defense, Hudson had initially denied shooting, or even possessing, a gun that day. Hudson was also cross-examined about the inconsistencies between his prior statements and his testimony at

trial.[2] He now argues on appeal that the circuit court erred "when it admitted the contents of any statement made by the Appellant on the day of his arrest as it could not be determined if he voluntarily made any statements after being physically hurt[.]"[3]

When we review the denial of a motion to suppress a custodial statement, we make an independent determination based on the totality of the circumstances. *Nelson v. State*, 2025 Ark. 11, 705 S.W.3d 876. We have explained that the circuit court's findings of fact are reviewed for clear error, and the ultimate question of whether a statement was voluntary is subject to an independent, or de novo, determination by this court. *Griffin v. State*, 2015 Ark. 340, 470 S.W.3d 676; *Clark v. State*, 374 Ark. 292, 287 S.W.3d 567 (2008). We defer to the superiority of the circuit court in evaluating the credibility of witnesses who testify at a suppression hearing. *Bishop v. State*, 2023 Ark. 150, 675 S.W.3d 869.

A statement made in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Halliburton v. State*, 2020 Ark. 101, 594 S.W.3d 856. In order to determine whether a waiver of *Miranda* rights is voluntary, knowing, and intelligent, we look at whether the statement was the product of free and

---

[2]A written statement signed by Hudson during his February 13 interviews was also admitted into evidence during his cross-examination. However, Hudson never mentioned this written statement either in his motion to suppress or at the suppression hearing, and it was not introduced into evidence at that hearing. Thus, it was not covered by the circuit court's ruling, and any argument regarding this statement is not preserved for our review. *E.g.*, *Lewis v. State*, 2017 Ark. 211, 521 S.W.3d 466.

[3]Hudson does not challenge the circuit court's ruling regarding his November 18, 2019 interview, and it is therefore deemed abandoned. *E.g.*, *Mister v. State*, 2022 Ark. 35, 639 S.W.3d 331.

deliberate choice rather than intimidation, coercion, or deception. *Id*. In making that determination, we consider the circumstances surrounding the waiver, including the age, experience, education, background, and intelligence of the accused. *Jackson v. State*, 2013 Ark. 201, 427 S.W.3d 607.

Hudson does not contend that his custodial statements on the day of the murder were obtained by intimidation, coercion, or deception. Rather, the sole basis for his argument that his *Miranda* waiver was involuntary and that his statements should have been suppressed is the injury to his head. He claims that he should have received medical treatment for the injury instead of being interrogated by the police. In a letter order detailing its reasons for denying Hudson's motion to suppress, the circuit court rejected this argument, finding from its review of the video recordings that, despite the visible red mark on Hudson's head, Hudson appeared to be completely coherent and gave a detailed recitation of his version of events. The court also noted that Hudson's story changed as he learned what investigators knew, further demonstrating his mental competence. The circuit court therefore concluded that Hudson knowingly, intelligently, and voluntarily waived his *Miranda* rights.

In light of our independent review, we agree that the State met its burden of showing that Hudson's waiver of his *Miranda* rights was knowing, intelligent, and voluntary. The video recording of the February 13 interviews, along with the signed waiver form, demonstrates that the interviewing officers thoroughly explained Hudson's constitutional rights before asking him any questions and that Hudson expressed his understanding of these rights before agreeing to give a statement. As the circuit court noted, Hudson spoke clearly

and coherently throughout his interviews, changing his story to be consistent with the additional information allegedly provided by third parties. With the exception of the introductory conversation about the bump on his head, Hudson did not complain about his injury during his statements; nor did he request medical attention at any time during these interviews. Thus, we affirm the circuit court's denial of Hudson's motion to suppress his statements.

For his final argument, Hudson contends that the record is insufficient for appellate review. After the record was lodged in this court, Hudson filed a motion to remand to settle the record. He asserted that the video-recorded interviews from February 13, 2019, and November 18, 2019, which were played at the suppression hearing, were not admitted into evidence. In addition, Hudson claimed that the portions of the videos that were played were not transcribed and that there were no time stamps noted on the record. Thus, Hudson argued, it was not clear which portions of the videos were actually played before the circuit court. We granted Hudson's motion on September 26, 2024.

The circuit court held hearings on the motion to settle the record on October 10 and 24, 2024. At the October 10 hearing, exhibits purportedly containing the recorded statements from both February 13 and November 18, 2019, were admitted into evidence. The State also indicated that the interviews would be transmitted to the court reporter to be transcribed. The prosecutor during Hudson's suppression hearing and trial, Dennis Molock, testified that he remembered playing the recorded statements from February 13 and November 18 at the suppression hearing. He stated that these interviews were played from the beginning to show the waiver of Hudson's *Miranda* rights, as well as Hudson's

14

demeanor and physical condition, in response to the arguments made by the defense in favor of suppression. However, Molock had no recollection of where he stopped the videos.

At a second hearing on October 24, the circuit court noted that it had learned from the court reporter following the October 10 hearing that the exhibits admitted at that hearing did not contain Hudson's second interview from November 18, 2019. The court indicated that the State had since provided a second thumb drive containing the missing portion of the interviews to the court reporter, that all of the interviews had been transcribed, and that the record was now complete. Hudson objected to the addition of the missing interview portions and also argued that the record could not be fully settled without knowing which portions were played at the suppression hearing. The circuit court disagreed and entered an order on October 25, 2024, finding that the record had been supplemented with the video interviews and denying Hudson's oral motion to find that the record could not be settled.

Hudson continues to argue on appeal that the record cannot be settled and remains insufficient for our review. He claims that he has sustained prejudice because there is no verbatim record of the interview portions that were played at the suppression hearing and that this hinders his appeal of the denial of his motion to suppress. He also contends that any additional interview recordings that were found by the State and sent to the court reporter are still not in the record and are therefore not reviewable by this court. According to Hudson, these deficiencies prevent us from performing our mandatory review of all adverse rulings pursuant to Ark. Sup. Ct. R. 4-3(a) and Ark. Code Ann. § 16-91-113(a) (Repl. 2016), and we must therefore reverse and remand for a new trial.

When there is an omission in the record, we consider whether the reconstructed record permits a full review of the proceedings from which an appeal has been taken. *Thrower v. State*, 2018 Ark. 256, 554 S.W.3d 825. Our concern with the sufficiency of the record is heightened when the appeal involves a life sentence. *E.g.*, *Hood v. State*, 329 Ark. 21, 947 S.W.2d 328 (1997). We have recognized that, while a verbatim record is certainly ideal, it is not required in every instance; instead, we evaluate whether the supplemental record enables a full and complete appellate review. *Thrower, supra.*

We conclude that the record in this case, as supplemented, is sufficient for a full appellate review. Although the record could not be settled regarding whether all, or only a portion, of the February 13 and November 18, 2019 interviews were shown at the suppression hearing, we know from the transcript of that hearing and from the prosecutor's testimony at the October 10, 2024 hearing that both videos were played from the beginning. Furthermore, the parties agreed at the suppression hearing that the recordings would be provided in their entirety to the circuit court for its review. We now have these recorded statements in the record, along with the transcriptions provided by the court reporter. While Hudson contends that it is unclear which additional portions were provided to the court reporter following the October 10 hearing, the exhibits in the record contain four video files from the February 13 interview and one video file of the November 18 interview. These recordings include the beginning of each interview, the reading of Hudson's *Miranda* rights and signing of the waiver forms, the discussion of Hudson's head injury, and Hudson's statements regarding Zack's shooting that were referenced at trial. We therefore have in the record all of the evidence necessary to review his argument on appeal about the denial of

16

his motion to suppress. In addition, we have the transcript of the suppression hearing, along with all of the other pretrial hearings and the jury trial, so that we can review any adverse rulings that occurred as part of our Rule 4–3(a) and section 16-91-113(a) review. Thus, the situation in this case is clearly distinguishable from the cases cited by Hudson wherein we reversed and remanded for a new trial based on an insufficient record. *See, e.g.*, *Thrower*, *supra* (reversing and remanding for new trial where multiple bench conferences, the parties' discussion of jury instructions, and the written jury instructions were all omitted from the reconstructed record); *Ward v. State*, 321 Ark. 659, 906 S.W.2d 685 (1995) (reversing and remanding for new sentencing trial because at least seven bench conferences were not recorded). Accordingly, we decline to reverse and remand for a new trial as requested by Hudson.

*Rule 4-3(a) Review*

Because Hudson received a life sentence, the record has been examined for all objections, motions, and requests made by either party that were decided adversely to him in compliance with Arkansas Supreme Court Rule 4-3(a), and no other prejudicial error has been found.

Affirmed.

*Sharon Kiel*, for appellant.

*Tim Griffin*, Att'y Gen., by: *David L. Eanes, Jr.*, Ass't Att'y Gen., for appellee.